**STATE of Missouri, Respondent,**

v.

**Bessie Fern BALDWIN, Appellant.**

**No. 16671.**

Missouri Court of Appeals, Southern District, Division One.

March 12, 1991.

Motion for Rehearing and Transfer Denied April 5, 1991.

Janet M. Thompson, Columbia, for appellant.

William L. Webster, Atty. Gen., David J. Hansen, Asst. Atty. Gen., Jefferson City, for respondent.

CROW, Judge.

A jury found defendant Bessie Fern Baldwin guilty of the class A felony of murder in the second degree, § 565.021, RSMo 1986, and assessed punishment at life imprisonment. The trial court entered judgment per the verdict.

Defendant appeals, presenting two assignments of error. The first asserts the trial court improperly allowed the prosecutor to elicit testimony that defendant underwent a polygraph examination; the second complains the trial court wrongly refused to give the jury a verdict-directing instruction on involuntary manslaughter. The claims of error require an account of the evidence.

At the time of the relevant events defendant was the wife of David Baldwin and the mother of two sons: David Wayne "Pete" Baldwin, age 13, and Clayton Baldwin, age 5. The family resided in a rural area of Webster County. Defendant's husband was employed by Danny Hicks, a dairyman, whose home was about a mile from the Baldwin residence.

On the morning of October 1, 1987, David Baldwin arrived at Hicks' dairy farm, completed the morning milking, and received his paycheck. He was supposed to return for work that afternoon but failed to appear.

About 9:00 that evening Hicks received a phone call from defendant asking whether he knew David's whereabouts. Hicks said David had gotten his paycheck that morning, had not shown up that afternoon, and he (Hicks) did not know where David was.

Some 50 minutes later defendant phoned Hicks again. Hicks testified: "She told me that she needed help, that her baby had been shot. Clayton had been shot." Defendant sounded extremely upset.

Hicks got a shotgun and, as he exited his home, his wife, Claudia, arrived. Hicks told her to call the police. He then drove to defendant's residence, arriving three or four minutes after defendant's call.

Defendant came outside and said Clayton had been shot. Hicks entered the house. Clayton was in a downstairs bedroom. Hicks observed Clayton was "pretty blue" and was making a strange noise, evidently gasping for air. Clayton's eyes were open but not moving. Hicks saw a wound in Clayton's side.

Hicks feared Clayton's assailant might still be in the house so he searched it, but found no one.

The next arrivals at defendant's residence were her sister, Susie Burchett, and Susie's husband, Jim. They were accompanied by defendant's son Pete, whom Susie had picked up at school after a basketball game.

Claudia Hicks, a registered nurse, arrived and examined Clayton. He was pale and cold, and his abdomen was distended from internal bleeding. He had a pulse and was breathing, but his breathing pattern was unstable. Claudia tended Clayton's wound and assisted his breathing.

An ambulance arrived about ten minutes after Claudia. The ambulance attendants attached a heart monitor to Clayton and inserted a tube to facilitate breathing.

Sergeant Jerry Lasater of the Missouri State Highway Patrol arrived at 10:19 p.m., immediately after the ambulance. Deputy sheriff Tom Fitch arrived some ten minutes after Lasater.

A helicopter arrived and transported Clayton to a Springfield hospital.

Deputy Fitch, in the presence of Sergeant Lasater, asked defendant what had happened. Defendant supplied the following narrative.

She arrived home with Clayton about 9:00 p.m., put his pajamas on him, and put him in bed. She then telephoned Danny Hicks trying to determine her husband's whereabouts. After that call she went outside for wood to start a fire, as the house was cold. While she was near the woodpile she heard a popping sound from the house. She rushed to the house and found Clayton gasping in bed. She saw some blood. She telephoned Jim Burchett and Danny Hicks. She noticed the back door of the house was open. It had been shut before the phone calls. After the calls she remained with Clayton until Danny Hicks arrived. She

saw no assailant and "didn't know who might have done it."

No further information was obtained from defendant, as she was "very upset, hysterical."

Sheriff Eugene Fraker of Webster County arrived around 11:00 p.m., and was briefed by Sergeant Lasater. The sheriff asked defendant what had happened. Defendant, still "very emotional, very hysterical," gave the same account she had given Lasater and Fitch. Defendant then departed with Susie Burchett for the hospital.

Pete Baldwin informed Sergeant Lasater that Pete's .410 shotgun was missing from his upstairs bedroom. Lasater accompanied Pete to the bedroom where Pete pointed out the rack where the gun was kept. Pete also showed Lasater an ammunition container and stated one shell was missing.

Sometime later, during a search of the grounds, Pete's shotgun was found beneath a bush 30 to 50 feet from the house. There was an expended shell in the breech. Lasater took possession of the shotgun.

Sheriff Fraker notified Sergeant Tom Martin of the Missouri State Highway Patrol about the shooting sometime after midnight. Martin directed Corporal John Bickers of the Patrol to go to the hospital where Clayton had been taken and contact the family. Sergeant Martin, accompanied by Sergeant Jack Merritt of the Patrol, proceeded to defendant's residence, arriving around 1:30 a.m.

Sergeant Lasater turned the .410 shotgun over to Sergeant Martin.

Clayton died some two hours after arriving at the hospital.

Corporal Bickers talked to defendant at the hospital after she had been told Clayton died. Defendant "was sobbing and obviously distressed." Defendant gave Bickers the same narrative she had given Lasater, Fitch and Fraker.

Around 1:00 p.m., October 2, Sergeant Martin contacted defendant at her sister's residence. Defendant gave him the same account of the incident she had given the other officers.

The next day, October 3, Sheriff Fraker contacted defendant at the Burchett residence. He asked whether there had been any "passers-by" or prowlers at defendant's residence prior to the shooting. Defendant supplied no new information.

Fraker arranged a meeting between defendant and Sergeants Martin and Merritt October 7 at the Webster County Courthouse. Defendant arrived with members of her family. The purpose of the meeting, said Martin, was: "We really needed to sit down with Mrs. Baldwin after she hopefully had calmed down a little bit and take a good in-depth statement from her and hopefully she could remember some things she might have forgot to tell us when we were out there. She was very emotional at the time that I tried to talk to her and I was hoping that after this time lapse that she would be in a better frame of mind to talk to, and she was."

Defendant related the same account she had given on previous occasions.

The next day, October 8, defendant told a relative, Marshall Eugene Cantrell, she would like to return to her residence "and try to remember something that maybe she had forgotten." Cantrell informed Sheriff Fraker. The sheriff arranged for Sergeants Martin and Merritt to accompany defendant to her residence.

Martin, Merritt, Cantrell and defendant arrived at defendant's residence about 2:30 p.m., October 8. Martin testified:

"She walked in [through] the front door there off the front porch and just as she got inside the door she—she started crying.... And she cried for just a few minutes and then she said—she looked up at the stairway and she said, 'I remember going upstairs.'

Q. And was that of any special significance to you?

A. Yes, it was because she had never mentioned to me about going upstairs.

Q. So what did you do at that point?

A. I said, 'Well, let's you and I go upstairs and see if you can remember anything else.' And we did and as we got to the top of the stairs she turned and she walked down the hall towards

Pete's bedroom. And as she walked into Pete's bedroom she stood there for a minute and she said, 'I was so scared. I heard a noise and I came up to get Pete's gun.' And then she just broke down and started crying and said, 'Oh, I hurt my baby.'"

At this point, said Martin, defendant was given time to regain her composure. He then advised her of her constitutional rights and asked whether she understood them. Martin quoted defendant as saying she did and "wanted to talk to us about it." The officers then took a tape-recorded statement from defendant. She said she had heard a noise, gotten Pete's gun, gone through the house with it, and it accidentally went off, shooting Clayton.

The officers asked defendant to accompany them through the house, demonstrating the route she traveled with the gun and "how it all happened." Defendant complied. Martin quoted defendant as saying she "was holding the barrel part of the gun in her left hand and the trigger part in her right hand." Martin's testimony continued:

"As she walked from this room—bathroom into the bedroom she would have been walking in this direction carrying the gun like this (indicating). The bed would have been over to her right and the gun barrel was pointed in this direction (indicating). She said when she came up along side the bed here was when the gun went off. The gun would have had to—she would have had to have turned the barrel the other direction.

Q. Okay, did you talk to her about that or question her about that?

A. Yes.

Q. And what did she tell you?

A. She just couldn't remember whether she turned around to the bed or how close she got up to the bed with the gun.

Q. Okay, so on that occasion at the Baldwin residence she was never able to explain to you how the gun had got turned to point towards Clayton?

A. No."

Martin and Merritt took defendant to the Webster County Courthouse where they talked to the prosecutor. Defendant was then taken to headquarters of Troop D of the Missouri State Highway Patrol in Springfield for interrogation by Corporal Bickers.

Martin observed part of Bickers' questioning of defendant. Martin heard defendant say her husband "wouldn't hold a job; he was drinking and wouldn't stay home." At the conclusion of Bickers' interview, Martin saw Merritt put his arm around defendant. Soon afterward, Merritt took a tape-recorded statement from defendant.

On cross-examination by defendant's lawyer, Martin stated he had not seen defendant receive anything to eat or drink. Martin testified defendant's interview by Bickers began before 4:30 p.m. When it ended, Martin and Bickers discussed confronting defendant and telling her she was not telling the truth. Martin entered the interview room "a little bit after 8:00" and talked with defendant about ten minutes, telling her she was lying and she needed to tell the truth. Defendant insisted she was telling the truth. Defendant made the tape-recorded statement to Merritt after the exchange between her and Martin.

When defendant's lawyer completed cross-examination of Martin, the prosecutor (outside the hearing of the jury) argued to the trial court that the cross-examination "opened up the inquiry of the State into the real reason why [defendant] was there which was to take a polygraph test." The prosecutor continued: "It was brought out by this witness that [defendant] was in Springfield at 4:00 o'clock, she was questioned and not allowed to leave until 8:00 o'clock, that she had no food or drink, that she was confronted and told that she was lying all which occurred after the polygraph test. You know if he's going to be allowed to bring out and establish to this jury that she was kept in a room and questioned for four solid hours, I think I'm entitled to explain to this jury why."

Defendant's lawyer protested that mentioning the polygraph would be prejudicial and it would appear the results were unfa-

vorable, as Martin confronted defendant after the test.

The trial court ruled the prosecutor could elicit testimony from Martin as to why the interrogation lasted so long, but not the results of the polygraph. Proceedings resumed in the presence of the jury and this dialogue ensued:

"Q. Sergeant Martin, there's been some testimony here on cross examination concerning the fact that Bess Baldwin was questioned for some four hours in Springfield—

A. Yes.

Q. —by Corporal Bickers. And I would like for you to tell the jury at this time the real reason why Bess Baldwin was taken to Springfield for questioning.

A. She was taken up for a polygraph examination."

Defense counsel objected that the reference to the polygraph examination was irrelevant, prejudicial, and violated defendant's due process rights under the Fourteenth Amendment. The objection was overruled. Martin's testimony resumed:

"Q. ... Have you sat in on other polygraph examinations before?

A. Yes.

Q. Numerous times?

A. Yes."

Defendant's lawyer renewed his objection; the trial court overruled it. Then, this:

"Q. ... What time period are we talking about for a normal polygraph examination?

A. Well, there's quite a lengthy format going into the thing. Also, before they actually get into ... there's a process that the operator goes into before he gets into any actual interview part of it. It lasts as much as two hours, the pre-test part of it. Corporal Bickers would be much more qualified to explain that than I would.

Q. ... From your experience though the entire process still takes some time?

A. Yes.

Q. As much as two hours for the pre-test?

A. Yes.

. . . .

Q. ... Now you testified on cross examination that at the conclusion of the testing by Corporal Bickers that you entered the polygraph room and questioned Bess Baldwin.

A. Yes.

Q. And the questioning which you conducted was done after the testing?

A. Yes.

Q. Is that the occasion that you confronted her?

A. Yes."

Corporal Bickers testified later in the trial. His account of what occurred at Patrol headquarters October 8 contained no reference to the polygraph. Asked what defendant told him that day, Bickers answered:

"She told me that she had returned from work that evening. The house was empty. She was fearful. She went to an upstairs bedroom and took from it a shotgun and returned to the downstairs portion of the home. She walked around the house apparently searching, went into the bedroom where she had placed the baby when she returned home. As she was walking around the bed the gun accidentally discharged and shot the child.

Q. Now during your questioning of Bess Baldwin on that occasion, did you question her concerning ... how she was holding the shotgun at the time it discharged?

A. Yes.... And she told me that she had come around the side of the bed where the baby lay and she was holding the gun pointed in the opposite direction of the baby and the bed.

Q. Okay, and did you question her concerning how the gun might have got turned around so that it was pointed at the baby?

A. Yes.

Q. And what did she tell you about that?

A. She didn't have an explanation."

Bickers added that defendant revealed her relationship with her husband was "troublesome" because of his inability to care for the family and accept responsibility as a husband. Defendant said her husband had an alcohol problem, had been incarcerated at times, and his work record "wasn't the best." Bickers confirmed defendant had a conversation with Sergeant Merritt about 8:00 p.m., as she was leaving the interview room.

Bickers was followed on the witness stand by Merritt. His account of what occurred at Patrol headquarters October 8, like Bickers' account, contained no reference to the polygraph. Merritt testified that after Bickers and Martin talked to defendant she stepped into an area designated as Merritt's office. Defendant appeared "very tense and emotional." Then, this:

"... I stepped up to her and put my arm on her shoulder and just told her to just let it out because I thought she was, you know, gonna cry.

Q. Well, what words did you use to her at that time? .

A. Just—I said, 'Just let it out'.
. . . .

Q. And what was her response?

A. She just started saying, 'I was so mad. I was so mad.' And she started relating what turned out to be the third accounting of the accident.

Q. Now did you offer her any encouragement or say anything else to her when she started relating this story to you?

A. Yes, sir. As she was starting to talk she was hesitant. And she would say, 'I was so mad. I was so mad' and she would hesitate and I realized what she was saying or I anticipated what she was saying and I told I said, 'Well, just tell the truth and go ahead and purge your soul' as she was hesitating. And you know, go ahead and tell me what occurred.

Q. And what did she tell you had occurred?

A. She stated that she ... had got the gun. She said when she got it she didn't know why. When she came down she had—well, she had heard a noise, I think, and she had got the gun. And as she came down and walked through the house that the gun—that she looked— that as she got to the bathroom door she looked at Clayton and thought that—she wished that it was David. And she knew that if Clayton wasn't there that David wouldn't bother them anymore. So she said, 'I guess I just shot him.' "

Merritt obtained a tape recorder, and defendant repeated the statement on tape.

An autopsy revealed a wound on the right side of Clayton's lower abdomen. It "was caused by an apparent shotgun blast." The wadding and numerous small pellets were found in the body. There was no gunpowder on the surface of the body and, according to the pathologist, "the margins of the wound were very sharp." There was no penetration of the skin other than the single wound of entry. The pathologist concluded he was "dealing with a contact wound."

At trial, Sergeant Martin described the shotgun he received from Sergeant Lasater at defendant's residence as a "single action" gun. He explained, "You would have to pull the hammer back until it was in a locking position and then pull the trigger." His testimony continued:

"Q. Can you describe the amount of force required to snap the trigger? Would you describe it as a light or a moderate or considerable in relation to other guns, average?

A. I would call it a heavy pull.

Q. And what do you mean by 'heavy pull'?

A. You have to pull the trigger with some force in order to get it to fire. There are varying degrees of pull on the trigger, you know, that will cause it to go off. This one you have to pull pretty hard on it.

Q. Have you attempted to cock that weapon, cock the switch on it and see if it could be jarred or caused to release by bumping the hammer?

A. I have, yes.

Q. And were you successful in getting it to fire by hitting the hammer or jarring the weapon in any way?

A. No."

Defendant's lawyer presented several witnesses. The gist of their testimony was that defendant was kind, considerate, and caring of others, and that she deeply loved her children.

Defendant, testifying in her defense, related her husband's drinking problem and lack of responsibility. He was in jail several times during the marriage, and there were occasions when he left her and the children for periods as long as a week. Asked about the shooting, defendant testified:

"[Clayton and I] went home and as we was coming down the hill I could see that David's car wasn't there. I just assumed he was still at work. So I called Danny and Danny said he hadn't seen him since that morning. We talked for a little while and then I went back, Clayton was asleep, I went back to him and put his pajamas on him. And then the dogs, they were barking and it was real dark and I got scared and I was just—would go and check on him every few minutes. And then I went—I thought of Pete's gun. I went upstairs and I got Pete's gun and I brought it back down. And I went in through like the dining room into the bathroom and back into the bedroom and when I got there by the bed it just went off."

Defendant's first point relied on is:

"The trial court erred in overruling [defendant's] objections to and allowing the State to elicit testimony about [defendant] having undergone a polygraph examination at the Troop D headquarters in Springfield because [defendant] was thereby denied her right to due process of law under the Fifth and Fourteenth Amendments to the United States Constitution and Article I, section 10 of the Missouri Constitution in that such evidence lacks in scientific reliability; it was not established that the tester was qualified; the polygraph is not susceptible of in-court examination; jurors may place inordinate weight on the results of the polygraph; and the admission of the polygraph allows the jury's function to be usurped, thus denying [defendant] the opportunity for a fair trial."

Results of polygraph examinations are inadmissible as evidence in Missouri courts. *State v. Biddle,* 599 S.W.2d 182, 191[6] (Mo. banc 1980). Additionally, the Supreme Court of Missouri declared in *State v. Woods,* 639 S.W.2d 818, 820 (Mo.1982), it is improper to admit evidence that polygraph tests have been taken even though the results are unmentioned. However, added *Woods,* evidence that such tests have been taken is not necessarily prejudicial. *Id.*

■ The State argues Sergeant Martin's testimony about the polygraph was admissible under the well settled rule that where either party introduces part of an act, occurrence, or transaction, the opposing party is entitled to introduce or to inquire into other parts of the whole thereof in order to explain or rebut adverse inferences which might arise from the fragmentary or incomplete character of the evidence introduced by his adversary—a rule that has been held to apply even though the evidence was in the first place illegal. *State v. Odom,* 353 S.W.2d 708, 711[4] (Mo.1962); *State v. Bendickson,* 498 S.W.2d 593, 594–95[3] (Mo.App.1973).

The State maintains defense counsel's objective in cross-examining Sergeant Martin about the length and circumstances of defendant's interrogation at Troop D headquarters was to create an impression that defendant's eventual admission to Sergeant Merritt was wrung from her by incessant and oppressive interrogation, and was consequently involuntary and unreliable.

In that regard, defense counsel established through cross-examination of Martin that (a) defendant had received nothing to eat or drink in Martin's presence—a time span commencing before 2:30 p.m., and extending past 8:00 p.m., (b) defendant's interview with Bickers began prior to 4:30 p.m., and lasted until about 8:00 p.m., (c) Martin did not recall defendant leaving the interview room during that period, (d) Mar-

tin confronted defendant after 8:00 p.m., and told her she was lying, and (e) defendant was "crying some" during the latter episode.

Without knowing a polygraph test was given and that two hours may be required for the "pre-test," the jury could have inferred defendant was subjected to unrelenting interrogation, without food or drink, until after 8:00 p.m., when she capitulated and told her interrogators what they demanded.

It is evident defense counsel's cross-examination of Martin was part of a defense strategy to disavow defendant's incriminatory statement to Sergeant Merritt. At trial, defendant testified she did not remember what she told Merritt, nor did she remember him recording their conversation. In final argument defense counsel asserted Bickers "kept trying to get her to admit this," and the jurors "don't know what state Bess was in" when she said, "I guess I just shot him."

While we find no Missouri case factually like this one, there is a case with some similarities. In *State v. Mick*, 546 S.W.2d 508 (Mo.App.1976), the accused, under questioning by her lawyer regarding her delay in informing police of a claimed alibi, answered she was talking to a detective "... and set up with him to take this polygraph test...." Over the accused's objection the State was thereafter allowed to establish, by questioning the accused, that she took a polygraph examination and failed it. The appellate court upheld the trial court, pointing out the accused volunteered that arrangements had been made for her to take the polygraph examination and thereby implanted in the jurors' minds that she had taken one. *Id.* at 509. Absent any further explanation the jurors may well have inferred the results were favorable to the accused. *Id.* The accused sought to gain certain benefits from her voluntary statement while simultaneously shielding herself from the adverse results. *Id.* The appellate court concluded that inasmuch as the accused voluntarily opened up the subject under questioning by her lawyer, she would not be heard to complain

she was prejudiced by the State's development of the matter thereafter, as the results of the test were within the fair purview of the accused's volunteered statement. *Id.*

When the issue arose in the instant case the trial court ruled that defense counsel, by his cross-examination of Sergeant Martin, "opened the door" to testimony that part of the time defendant was at Troop D headquarters was used for a polygraph examination.

In *United States v. Johnson*, 816 F.2d 918 (3d Cir.1987), a theft suspect was given a polygraph examination, the result of which indicated he was guilty. He eventually confessed. At trial the judge stated he would allow the prosecution to introduce rebuttal evidence concerning the polygraph examination if the accused attempted to use the circumstances attending the polygraph examination to show his confession was coerced. *Id.* at 923. On appeal the accused claimed the trial judge impermissibly restricted his ability to cross-examine witnesses about the voluntariness of his confession. The appellate court rejected the argument, declaring evidence concerning a polygraph examination may be introduced to rebut an assertion of coercion of a confession. *Id.* at 923[6]. In support of that proposition *Johnson* cited *United States v. Kampiles*, 609 F.2d 1233 (7th Cir.1979), *cert. denied*, 446 U.S. 954, 100 S.Ct. 2923, 64 L.Ed.2d 812 (1980).

In *Kampiles* the accused confessed after taking and failing polygraph examinations. At trial he undertook to testify that his confession was extracted by threats against his relatives by his interrogator. The judge ruled that if the accused pursued the subject the judge would permit the prosecutor to present evidence that the accused failed the polygraph, as the prosecution's theory was that failing the polygraph precipitated the accused's confession. On appeal the accused argued it would have been error for the judge to receive the polygraph evidence, hence the judge wrongly conditioned the exclusion of such evidence on the accused remaining silent regarding the alleged threats by the inter-

rogator. The appellate court disagreed, stating the probative value of the polygraph evidence regarding the voluntariness of the confession sufficiently outweighed the prejudice to the accused, and such evidence would have been admissible had the accused pursued the voluntariness issue. *Id.* at 1244–45.

In the instant case the prosecutor presented no evidence regarding the result of the polygraph examination. The prosecutor limited his evidence to a showing by one witness (Martin) that defendant was taken to Troop D headquarters for a polygraph examination, that the "pre-test" routine can require as much as two hours, and that Martin's confrontation of defendant (shortly after 8:00 p.m.) occurred "at the conclusion of the testing by Corporal Bickers."

Later, Bickers testified his questioning of defendant ended about 4:45 p.m. It is inferable from this evidence that the interval from 4:45 p.m., until 8:00 p.m., was devoted to the "pre-test" and the administration of the polygraph examination, not to arduous interrogation of defendant. That, of course, was just what the prosecutor was endeavoring to show.

■ Where the accused has injected an issue into the case, the State may be allowed to present otherwise inadmissible evidence to explain or counteract a negative inference raised by the issue the accused injects. *State v. Lingar*, 726 S.W.2d 728, 734–35[8] (Mo. banc 1987), *cert. denied*, 484 U.S. 872, 108 S.Ct. 206, 98 L.Ed.2d 157 (1987).

Defendant asserts the result of the polygraph examination was placed before the jury. Defendant points out that prior to any mention of the polygraph, Martin testified he and Bickers discussed confronting defendant and telling her she was not telling the truth. This discussion occurred after Bickers' interview with defendant. This testimony, however, was elicited by defense counsel on cross-examination. On redirect examination Martin testified his confrontation with defendant occurred "after the testing."

Defendant contends the clear inference from the above testimony is that she took a polygraph, flunked it, and was then accused by Martin of lying.

We believe, however, it is just as likely the jury could infer the officers disbelieved defendant because her narrative at her residence October 8 contradicted her earlier accounts and she never supplied a plausible explanation of how the shotgun happened to be pointed at Clayton when it discharged.

■ Defendant also argues that Martin's testimony about the polygraph was prejudicial because her credibility "was the sole true issue in the case." We disagree. Even if the jury inferred the result of the polygraph examination was unfavorable to defendant, there was evidence far more significant than that on whether Clayton's death was accidental. In addition to the conflicting accounts given by defendant and her lack of an explanation of how the shotgun came to be pointed at Clayton when it fired, there was uncontradicted testimony by the pathologist that Clayton's wound was a "contact wound," i.e., the muzzle was touching Clayton when the gun went off. Furthermore, there was undisputed evidence that the shotgun had to be cocked before it would fire, that its trigger required a heavy pull, and that it could not be accidentally discharged by hitting the hammer. This evidence was eminently more damaging to defendant than any inference the jury might have drawn about the polygraph result.

We hold Sergeant Martin's testimony regarding the polygraph was admissible to rebut the evidence elicited by defendant about the duration and circumstances of her interrogation at Troop D headquarters. Furthermore, given the other evidence discrediting defendant's claim of accident, we reject her contention that she was prejudiced because the jury could have inferred the polygraph result was unfavorable to her. Defendant's first point is denied.

Her second point:

"The trial court erred in refusing to submit to the jury Instruction No. 5A, tendered by defense counsel, on involun-

tary manslaughter because [defendant] was thereby denied her right to have the jury fully and completely instructed as to the applicable law in that the evidence adduced at trial supported a finding of guilty of involuntary manslaughter, a lesser included offense of second degree murder as [defendant] herself testified that she wandered through the house pointing a loaded gun and thus her conduct was reckless as it created a substantial and unjustifiable risk of death and she consciously disregarded that risk."

Contrary to the averment in the second point, we find no testimony by defendant that she was "pointing" the shotgun. Her testimony regarding the shooting is quoted earlier in this opinion. Nowhere in that testimony did defendant say she pointed the gun anywhere. All she said was that when she was in the bedroom by the bed the gun "just went off." Neither in her pretrial statements nor her trial testimony did defendant offer any explanation as to how the gun came to be pointed at Clayton when it fired.

A person commits the crime of involuntary manslaughter if he recklessly causes the death of another person. § 565.024.1(1), RSMo 1986; *State v. Tate*, 733 S.W.2d 45, 48 (Mo.App.1987). That type of involuntary manslaughter is a lesser degree offense of murder in the second degree. § 565.025.2(2)(b), RSMo 1986; *State v. Hamlett*, 756 S.W.2d 197, 199 (Mo. App.1988); *State v. DeWeese*, 751 S.W.2d 389, 391[1] (Mo.App.1988); *Tate*, 733 S.W.2d at 48.

Section 556.046.2, RSMo 1986, provides:

"The court shall not be obligated to charge the jury with respect to an included offense unless there is a basis for a verdict acquitting the defendant of the offense charged and convicting him of the included offense."

The above provision applies in homicide cases. *State v. Merchant*, 791 S.W.2d 840, 842 (Mo.App.1990); *Tate*, 733 S.W.2d at 48.

■ For involuntary manslaughter to be submitted there must be sufficient evidence to support a finding of recklessness. MAI–CR 3d, Supp. Notes on Use Applicable to 313.00 Series, 313.00.4(B)(3); *State v. Green*, 778 S.W.2d 326, 327[2] (Mo.App. 1989).

■ In the instant case Instruction 5A tendered by defendant and refused by the trial court was patterned on MAI–CR 3d 313.10. On the issue of recklessness the instruction read:

"In determining whether the defendant recklessly caused the death of Clayton Baldwin, you are instructed that a person acts recklessly as to causing the death of another person when there is a substantial and unjustifiable risk he will cause death and he consciously disregards that risk, and such disregard is a gross deviation from what a reasonable person would do in the circumstances."

That paragraph is obviously based on § 562.016.4, RSMo 1986, which provides:

"A person 'acts recklessly' or is reckless when he consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation."

Defendant cites no case where a conviction of murder in the second degree was reversed because the trial court failed to instruct on involuntary manslaughter. Both homicide cases cited by defendant held the evidence failed to warrant an instruction on involuntary manslaughter. *Green*, 778 S.W.2d at 327–28[3]; *Hamlett*, 756 S.W.2d at 199–201[5].

Astonishingly, the closest case we find on the facts is *State v. Bartley*, 337 Mo. 229, 84 S.W.2d 637 (1935). There the accused was convicted of murder in the second degree. His testimony was that he was standing in a wagon and picked up a shotgun to unload it. As he prepared to break it down the wagon tipped, throwing him off balance. As he started to fall the gun went off. He did not know whether it caught in a hole in his coat. The blast struck the victim, who was a few feet from the wagon, killing him. The Supreme Court of Missouri held the accused's testi-

mony supported an instruction submitting the defense of accident, but did not warrant a manslaughter instruction. 84 S.W.2d at 640.

An example of conduct which supports a submission of involuntary manslaughter is found in *State v. Miller*, 772 S.W.2d 782 (Mo.App.1989). There the accused had a quarrel with another man at a tavern. Later, while the accused was outside, his adversary exited the tavern. The accused got a rifle from his vehicle. The prosecution's evidence showed the accused pointed the rifle at the adversary and fired. The bullet missed the adversary but struck and killed a patron in the tavern. The accused's evidence was that just before the rifle fired the adversary was threatening him and his female companion, and that he (the accused) was holding the rifle at his waist when his female companion grabbed it and it discharged accidentally. The accused knew the rifle had a safety but was unaware whether it was on or off. He knew the rifle was loaded. There was evidence that as many as 25 people were in the tavern and the rifle had been pointed toward the door just before the shot. The accused was charged with murder in the second degree, but convicted by a jury of involuntary manslaughter. On appeal he maintained he was either guilty of murder in the second degree or nothing at all, as there were no facts to support a submission of involuntary manslaughter. *Id.* at 783. This Court held the jury could have determined the accused did not intentionally fire the rifle at the adversary, but was reckless in holding it pointed toward the tavern door with the safety off when he could have anticipated it might fire for some reason, including that someone might try to disarm him. *Id.* That evidence was sufficient to support the involuntary manslaughter submission. *Id.* at 784.

In the instant case defendant did not testify she loaded or cocked the shotgun, or that she was aware it was loaded and cocked before it went off. She likewise had no explanation as to how it came to be pointed at Clayton when it discharged. She did not testify she aimed it at anyone or anything, or that she was aware of where the muzzle was pointing when it fired. There was no evidence defendant was waving the gun around indiscriminately or otherwise handling it in conscious disregard of a substantial and unjustifiable risk of someone's death, or that anything defendant did was a gross deviation from what a reasonable person would do in the circumstances. Such conduct, as we have seen, is required by MAI–CR 3d 313.10 to support a conviction of involuntary manslaughter.

On the prosecution's evidence defendant was guilty of murder in the second degree. On defendant's evidence Clayton's death was accidental and she was guilty of nothing.

Defendant's second point is denied and the judgment is affirmed.

PREWITT, J., concurs.

MAUS, P.J., dissents.