STATE of Missouri, Respondent,

v.

Gregory J. GRAY, Appellant.

Gregory J. GRAY, Appellant,

v.

STATE of Missouri, Respondent.

Nos. 18861, 20177.

Missouri Court of Appeals,
Southern District,
Division Two.

May 16, 1996.

Emmett D. Queener, Columbia, for appellant.

Jeremiah W. (Jay) Nixon, Attorney General, Kurt V. Schaefer, Asst. Atty. Gen., Jefferson City, for respondent.

CROW, Judge.

A jury found Appellant, Gregory J. Gray, guilty of an attempt to commit forcible rape, § 566.030, RSMo Cum.Supp.1991.[1] The trial court, having found Appellant a persistent sexual offender, § 558.018, RSMo Cum.Supp. 1991,[2] sentenced him to seventy years' imprisonment. Appellant brings appeal 18861 from that judgment.

While that appeal was pending, Appellant filed a motion to vacate the judgment and

---

1. Section 566.030, RSMo Cum.Supp.1991, reads, in pertinent part:

"1. A person commits the crime of forcible rape if he has sexual intercourse with another person without that person's consent by the use of forcible compulsion.

2. ... an attempt to commit forcible rape as described in subsection 1 of this section ... is a felony for which the authorized term of imprisonment ... is life imprisonment or a term of years not less than five years...."

2. Section 558.018, RSMo Cum.Supp.1991, reads, in pertinent part:

"....

3. The term of imprisonment for one found to be a 'persistent sexual offender' shall be not less than thirty years, which term shall be served without probation or parole."

sentence per Rule 29.15.[3] The motion court denied relief after an evidentiary hearing. Appellant brings appeal 20177 from that order.

We consolidated the appeals, Rule 29.15(*l* ), but address them separately in this opinion.

### Appeal 18861

The first three of Appellant's four points relied on pertain to this appeal. They aver: (1) the evidence was insufficient to support the verdict, (2) the trial court committed plain error in denying Appellant's request for mistrial when the victim testified Appellant looked like he wanted to rape her, and (3) the trial court erroneously overruled an objection by Appellant when the prosecutor, during closing argument, made "an indirect reference" to Appellant's failure to testify.

■ In adjudicating Appellant's first point, we determine whether there is sufficient evidence from which a reasonable juror might find Appellant guilty beyond a reasonable doubt. *State v. Harris,* 870 S.W.2d 798, 811[26] (Mo. banc 1994), *cert. denied,* — U.S. —, 115 S.Ct. 371, 130 L.Ed.2d 323 (1994). In that determination, we accept as true all evidence favorable to the verdict, including all favorable inferences drawn from the evidence. *Id.* at 811[27].

On Sunday, July 26, 1992, K——— was employed as a computer system operator at a medical center in Joplin. Her work station was in a physicians' office building, south of a hospital. An underground tunnel "about 150 feet long" connected the office building to the hospital. The medical center's security office was in the hospital.

Around noon that day, Appellant entered the security office. Tom Kilpatrick, a security officer, was on duty. Appellant asked Kilpatrick whether there were "any A.A. meetings." Kilpatrick directed Appellant to such a meeting at the "Detox" building "across the street . . . just east of the hospital."

Describing the security office, Kilpatrick explained that upon entering, a visitor sees "a bunch of [closed circuit television] monitors" behind a counter which separates visitors from security personnel. The monitors are connected to cameras throughout the hospital. Kilpatrick's testimony:

"Q. . . . did [Appellant] look at the monitors?

A. Yes, he did look at them.

Q. For any length of time?

A. Yes.

Q. How long?

A. During the time that I was talking with him, he stared at them.

Q. Instead of looking at you?

A. Yes."

K——— was assigned the "second shift" that day (3:00 p.m. until 11:30 p.m.). She arrived at 3:00 and entered the office building from the parking lot through a locked door to which she carried a key.

The "first shift operator" was in the work area when K——— arrived. K——— entered the work area through an interior door which, although usually locked, was left unlocked during shift changes. K——— left the door unlocked.

The first shift operator departed around 3:35, leaving K——— alone in the work area. Shortly thereafter, K——— locked the door securing the work area.

About 3:40, K——— heard a noise. She looked into the hall to "see if security was making their rounds." She saw nothing, so she started toward the computer room. As she neared it, Appellant appeared from be-

---

**3.** Rule references are to Missouri Rules of Criminal Procedure (1993). That is because Appellant was sentenced June 7, 1993, and his motion for post-conviction relief was filed October 12, 1993. The current (1996) version of Rule 29.15(m) provides that in such circumstances, post-conviction relief is governed by the version of Rule 29.15 in effect when the motion for post-conviction relief was filed.

hind a bathroom door and approached her. Appellant was wearing blue jeans and a turquoise T-shirt. K_____ had never before seen him.

When Appellant was "within arm's length," he told K_____, "Come on, let's do something." K_____ replied, "No." Appellant thereupon "became violent," grabbing K_____ around her "shoulder areas." Appellant "looked very angry."

The next segment of K_____'s testimony is the subject of Appellant's second point. To avoid reciting the passage out of context later when we address Appellant's second point, we set it forth now:

"Q. ... You say he looked angry. Tell the jury what you meant. Why, why do you say he looked angry?

. . . .

A. Because he looked, he looked like he wanted to hurt me, to rape me."

At that juncture, Appellant's lawyer objected. The specifics of the objection and the exchange that followed it are recounted *infra* when we reach Appellant's second point.

K_____ testified she "ended up on the floor." Appellant was above her, his knees on the floor outside hers. K_____ fought, trying to protect herself. She was screaming, "Leave me alone."

Asked what Appellant was doing, K_____ answered: "He is grabbing at me.... My chest area. My upper body area. My face." Then, this:

"Q. Did he grab your breasts?

A. Yes.

Q. More than once?

A. I would say yes.

Q. Do you know how many times?

A. No idea.

. . . .

Q. ... Did he ever strike you in the face or touch you in the face?

A. Yes. He had his hands on my face, on my face.

Q. Okay. What did he do with his hand on your face, or hands on your face?

A. ... He didn't punch me, but he just had his hand on my face like he was trying to cover my mouth.

. . . .

Q. Did the Defendant say anything to you while he was over you when you say he was in the kneeling position?

A. He said, 'Come on, let's do something,' at least one more time."

K_____ continued to resist, attempting to push Appellant away with her hands and kicking with her legs and feet. During the struggle, Appellant tried to remove K_____'s shirt. K_____ "broke a chain" that she assumed was hers. She also grabbed Appellant's shirt and ripped a piece from it.

Appellant ultimately abandoned the attack and fled. K_____ phoned the security office and reported there was a man in the building and she had been attacked.

Terry Hylton, a security officer, was in a "security vehicle" on the "north parking lot" of the medical center. He received a call from the security dispatcher about a man being inside the physicians' office building.

Hylton drove to the northeast door of the office building. Upon exiting his vehicle, Hylton encountered Appellant coming out the door. The door was on the first floor of the building, the same floor as K_____'s work station. Appellant was clad in blue jeans and a torn turquoise T-shirt.

Hylton asked Appellant what he was doing. Appellant replied he "was up on the second floor." Aware there were window cleaners in the building, Hylton asked Appellant whether he was "with the window cleaners." Appellant indicated he was. Hylton asked Appellant to accompany him inside "to verify this."

Faced with that request, Appellant ran south from the office building toward the "Brady building," some two tenths of a mile

distant. Hylton pursued on foot, but Appellant "was quite a bit faster." Using a portable radio, Hylton reported his pursuit to the security dispatcher.

Hylton saw Appellant enter the Brady building. Hylton ceased his pursuit and went to K_____'s work station in the office building. K_____ told Hylton what had occurred and handed him the fragment she had ripped from Appellant's shirt. The chain K_____ had torn during the struggle was on the floor near the bathroom. She saw it was not hers, and realized she had pulled it off Appellant.

Security officer Kilpatrick was in the security office when K_____ reported the attack. He ran to the physicians' office building through the tunnel. Upon reaching it, he learned Hylton was pursuing a man clad in jeans and a turquoise shirt. Kilpatrick exited the office building and went south toward the Brady building. He saw a man "running across the lot [who] fit the description."

Kilpatrick heard Hylton say the man entered the Brady building. Kilpatrick entered the Brady building and found Appellant. Kilpatrick told Appellant to "have a seat." Appellant complied. Kilpatrick noticed Appellant was "real nervous, fidgety." Kilpatrick told Appellant the police wanted to talk to him.

The "automatic doors" opened and Appellant "darted out." Kilpatrick pursued Appellant, overtook him, and "attempted to take him to the ground." Appellant freed himself and resumed running. Kilpatrick gave chase.

Appellant ran across a street to a laboratory building off the medical center property. Kilpatrick kept Appellant in sight until he disappeared in "a grassy area, a weedy area" south of the laboratory building. Police officers arrived, and Kilpatrick joined them in searching the area. The search was unsuccessful.

Some 30 to 45 minutes after Appellant disappeared, Kilpatrick and the medical center's security director were on the laboratory building's parking lot. They "started talking about getting a dog to go look for him." A few seconds later, Appellant "popped right up" out of the weeds and surrendered.

A police officer took custody of Appellant, placed him in a patrol car, and drove to the physicians' office building. K_____ came outside and identified Appellant as her assailant.

At trial, K_____ was asked whether she sustained any injuries in the attack. She replied: "Besides soreness all over, I received a pretty good lump on the back of my head."

A registered nurse who was asked by security personnel to examine K_____ arrived at K_____'s work station around 3:55 p.m., shortly after the attack. The nurse observed a "reddened area" on K_____'s left cheek and the bump on K_____'s head. K_____ was sobbing, shaking, and "very distraught."

■ Appellant's theory that the evidence was insufficient to support the verdict is, in his words: "[T]he State ... did not produce sufficient evidence to convince a reasonable trier of fact that [Appellant's] conduct was a substantial step toward the commission of forcible sexual intercourse without consent."

Appellant points out: (1) K_____ testified Appellant never attempted to remove her pants, and (2) K_____ did not testify Appellant touched her genitalia or that he attempted to remove or lower his pants or expose his penis. Consequently, argues Appellant: "Reasonable jurors could not have inferred that [Appellant] was attempting to commit a forcible rape. Such a conclusion is nothing more than speculation."

In support of that hypothesis, Appellant cites *State v. Molkenbur*, 723 S.W.2d 894 (Mo.App.S.D.1987), and *State v. Anderson*, 814 S.W.2d 14 (Mo.App.E.D.1991). In each case the accused was convicted of attempted forcible rape and maintained on appeal that the evidence was insufficient to support the conviction. In each case the appellate court

rejected the contention and affirmed the conviction.

In *Molkenbur*, the victim was alone in an apartment, clad in a nightgown and robe. About 10:00 p.m., she heard a knock at the door. Upon opening it, she encountered the accused, whom she had never met. He asked for someone with a surname unfamiliar to her. She closed the door.

A half hour later, the victim heard another knock. When she opened the door, the accused entered, grabbed her, and tried to cover her mouth. She broke free and attempted to run, but either fell or was knocked down just outside the door. The accused put his hand inside her nightgown and tried to pull her back into the apartment. She screamed and he fled. He was apprehended a few blocks away. His shirt was unbuttoned and his pants unzipped.

The appellate court held the jury could infer the accused's pants were unzipped when he fled the apartment. 723 S.W.2d at 896. The appellate court further held:

> "Forcing his way into an apartment, grabbing a woman who tried to leave the apartment, and trying to pull her back into the apartment with his pants unzipped, were sufficient for the jury to find that [the accused] entered the apartment with the purpose of rape." *Id.*

Appellant, as we understand him, insists the instant case is weaker than *Molkenbur* in that here, there was no evidence that Appellant's pants were unzipped. However, there was incriminatory evidence in the instant case that was not present in *Molkenbur.*

Appellant entered K_____'s work area surreptitiously and concealed himself until K_____ was alone. Upon approaching K_____, Appellant said, "Come on, let's do something." When K_____ replied, "No," Appellant grabbed her, wrestled her to the floor, straddled her, grabbed her breasts, attempted to remove her shirt, and tried to cover her mouth to silence her screams. According to K_____, the second time Appellant said, "Come on, let's do something," he

was grabbing at her "chest area and ... shirt."

Furthermore, the attack here lasted longer than the one in *Molkenbur*. K_____ estimated its duration at five to ten minutes. That is apparently accurate. As noted earlier, the attack began around 3:40, and the nurse who was called by security personnel after K_____ reported the attack arrived at K_____'s work station around 3:55. Thus, Appellant persisted in attempting to overcome K_____'s resistance far longer than the accused in *Molkenbur.*

In *Anderson*, the other case relied on by Appellant, the victim was walking in her neighborhood around 10:40 p.m. The accused approached her from behind, grabbed her in the shoulder area, and tried to pull her into a nearby wooded area. A struggle ensued, during which the victim fell on her buttocks. The accused knelt behind her and reached around, putting his hands on the sides of her pants. He then tried to push her pants off, telling her: "Be quiet and hold still." The victim, who had been screaming, continued to do so. The accused moved his hands and began rubbing the victim's genital area.

The victim broke free and ran to some nearby apartments. A group of residents caught the accused. When captured, his pants were unzipped. The accused told a police officer he was not trying to rape the victim, but was just trying to get money. He explained that when he saw the victim had no purse, he tried to take her pants down to see if she had a wallet.

The appellate court held the intent to engage in sexual intercourse without the victim's consent may be proved by circumstantial evidence, as there is rarely direct evidence of an assailant's intent. 814 S.W.2d at 16[1]. Finding the evidence sufficient, the appellate court said:

> "There is a 'modern' trend to infer an intent to rape from an assailant's actions and we believe that the facts that were adduced at trial would be sufficient for a

jury to find that the [accused] attempted forcible rape on [the victim]." *Id.* at [2].

Aside from the accused's pants being unzipped in *Anderson,* the only difference between that case and the instant case is that in *Anderson* the accused rubbed the victim's genital area and tried to pull her pants down, whereas here Appellant grabbed K_____'s breasts and tried to remove her shirt. Given the position of K_____ and Appellant on the floor (Appellant astraddle K_____ with his knees outside hers), and recalling that Appellant was attempting to put his hands on K_____'s mouth to stifle her screams, the jury could have readily inferred Appellant believed it would be easier to disrobe K_____ by removing her shirt before trying to remove her pants.

Furthermore, unlike *Anderson,* there was no suggestion in the instant case that theft was the purpose of the attack. Appellant's command, "Come on, let's do something," demonstrates his intent was not to take money or property from K_____, but instead to compel her to engage in some act with him. Inasmuch as she was at work and had never before seen him, it is inferable he did not expect her to accompany him anywhere or participate with him in any social or recreational activity.

It is also noteworthy that there was no evidence that Appellant had any reason to attack K_____ because of a prior grudge or quarrel. Thus, the jurors could have readily inferred Appellant attacked K_____ with the intent to force her to submit to sexual intercourse. In that regard, the jurors could have reasonably found Appellant studied the surveillance monitors in the security office and chose the site of the attack because it was in a separate building outside the range of the surveillance system.

We hold the evidence sufficient to support a finding by a reasonable juror, beyond a reasonable doubt, that Appellant's purpose in attacking K_____ was to have sexual intercourse with her by forcible compulsion. We further hold the evidence sufficient to support a finding by a reasonable juror, beyond a reasonable doubt, that Appellant's actions during the attack constituted a substantial step toward commission of that offense. Appellant's first point is denied.

As reported earlier, Appellant's second point arises from K_____'s testimony (quoted *supra*) that Appellant "looked like he wanted to hurt me, to rape me."

Outside the hearing of the jury, Appellant's lawyer ("defense counsel") objected, asserting the testimony was conclusional and speculative as to Appellant's intent. After registering that objection, Appellant's lawyer asked for a mistrial, accusing the prosecutor of an "intentional attempt to get [K_____] to say in her opinion [Appellant] was attempting to rape her."

The prosecutor denied the accusation, insisting he "had no idea she was going to say that."

The trial court denied the request for mistrial, whereupon defense counsel asked the court to admonish the jury to disregard the answer. The court did so.

■ In his brief, Appellant concedes the request for mistrial was based on alleged misconduct of the prosecutor. As we comprehend Appellant's brief, he is abandoning the misconduct accusation on appeal. Instead, Appellant seeks plain error review of the denial of a mistrial, arguing that K_____'s testimony "was conclusory and invaded the province of the jury, the prejudicial effect of which could not be removed."

According to Appellant's brief:

"Whether [Appellant] intended to rape [K_____] was the ultimate question of fact to be determined by the jury. Although the trial court instructed the jury to disregard [K_____'s] statement that she believed [Appellant] was going to rape her, 'how do you unring a bell?' *State v. Shepard,* 654 S.W.2d 97, 101 (Mo.App., W.D.1983). By failing to meet its obligation to assure a fair trial, the court abused its discretion."

■ Although Appellant charges the trial court with abusing its discretion, that is not

the standard of review for plain error. To prevail on plain error review, Appellant must show the trial court's error so substantially violated Appellant's rights that manifest injustice or a miscarriage of justice will result if the error is left uncorrected. *State v. Parker*, 886 S.W.2d 908, 917[8] (Mo. banc 1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 1827, 131 L.Ed.2d 748 (1995).

Appellant cites no case were an appellate court reversed a trial court for plain error in refusing to grant a mistrial when a witness gave an objectionable answer. We decline Appellant's invitation to do so here.

In arguing for a reversal, Appellant complains that the jury "reached the conclusion in only eighteen minutes that [Appellant's] intent was to rape [K_____]."[4] Appellant maintains that except for K_____'s testimony that Appellant looked like he wanted to rape her, there was no evidence to support an inference that his intent was to engage in sexual intercourse. Appellant asserts: "[O]nce the jury heard [K_____] say that she believed [Appellant] was going to rape her, the outcome of the case was clear."

In denying Appellant's first point, we rejected his claim that the evidence was insufficient to support a finding that he intended to have sexual intercourse with K_____. As explained in that part of the opinion, there was abundant evidence—apart from K_____'s challenged answer—that Appellant intended to have sexual intercourse with K_____. Therefore, Appellant's second point is based on a fictitious premise.

Assuming, without deciding, that K_____'s challenged answer was objectionable as conclusional and speculative, we find no manifest injustice or miscarriage of justice in the denial of a mistrial. The trial court admonished the jury to disregard the answer, and the prosecutor did not mention it thereafter.

In *Parker*, 886 S.W.2d at 922, a witness in a murder trial testified she and the victim

were being followed and, although the witness could not identify the pursuer, she was told it was the accused. The trial court sustained a hearsay objection and instructed the jury to disregard the testimony, but denied the accused's motion for mistrial. Affirming the conviction (and death sentence), the Supreme Court of Missouri held that instructing the jury to disregard the accused's identification was an adequate remedy, and the trial court did not abuse its discretion in denying a mistrial. *Id.* at [38].

Consistent with *Parker*, we hold the trial court's admonition to the jury in the instant case to disregard K_____'s challenged answer was an adequate remedy, and the court committed no plain error in denying Appellant's request for a mistrial. Appellant's second point is denied.

Discussion of Appellant's third point requires a brief account of some testimony not previously synopsized.

■ After security officer Kilpatrick testified on direct examination that Appellant entered the security office and asked whether there were "any A.A. meetings," defense counsel elicited testimony from Kilpatrick on cross-examination that the next such meeting was around "6:30." Defense counsel also adduced testimony from Kilpatrick that some of the meetings were held "in the hospital." On redirect examination by the prosecutor, Kilpatrick explained that no such meetings were held in the physicians' office building or near the tunnel.

During final argument, the prosecutor said:

"You remember Tom Kilpatrick has come down this tunnel. And you've seen the pictures. You think it's very reasonable that Gray was looking for an A.A. meeting? And, of course, there's no evidence of that. That's only suggested by [defense counsel's] questions, and there's

---

**4.** Actually, the jury reached a verdict in only fifteen minutes. According to the transcript, the jury retired to deliberate at 10:59 a.m., and indicated it had reached a verdict at 11:14 a.m. It took three additional minutes to assemble the participants in the trial and escort the jury to the courtroom.

no evidence that that's what he was there for."

Defense counsel objected, saying the prosecutor was "making an indirect reference to the Defendant's inability [sic] to testify."

The trial court overruled the objection.

Appellant's third point asserts the prosecutor's argument was an indirect reference to Appellant's failure to testify in that there was only one person who could testify as to "what [Appellant] was there for," and that person was Appellant. Consequently, argues Appellant, the trial court's ruling constituted reversible error.

■■■ The Supreme Court of Missouri recently addressed this area of the law in *State v. Redman*, 916 S.W.2d 787 (Mo. banc 1996), saying:

> "Defendants in criminal cases are guaranteed the right not to testify. Comments, direct or indirect, on a defendant's failure to testify are forbidden. It is permissible, however, for a prosecuting attorney to argue the effect of evidence presented and the reasonable inferences drawn from the evidence. A prosecutor may argue that evidence is uncontroverted or uncontradicted.
>
> [I]ndirect comments on [a defendant's] failure to testify [are] permissible unless, by reason of a calculated intent on the part of the prosecutor, they magnif[y] [the defendant's] decision not to testify so as to call that decision to the jury's attention. If a comment demonstrates a calculated intent by the prosecutor to draw attention to a defendant's failure to testify, it warrants reversal." (Citations omitted.)

*Id.* at 792–93 [7, 8] and [9].

Here, defense counsel established by Kilpatrick's testimony that an A.A. meeting was scheduled for around 6:30, and that at least some such meetings were held in the hospital. We see no reason for defense counsel to present such testimony other than to suggest to the jury that Appellant came to the hospital to attend the 6:30 meeting.

However, the record is void of evidence that Appellant ever attended an A.A. meeting or that he was a member of the group scheduled to meet at 6:30. Such evidence—had it existed—could have been supplied by testimony of someone other than Appellant. Furthermore, the 6:30 meeting was scheduled for the "Detox" building, across the street from the hospital, and the prosecutor, on redirect examination of Kilpatrick, established that no A.A. meetings were held in the physicians' office building or near the tunnel.

Given this record, we find nothing wrong in the prosecutor's argument that the only suggestion that Appellant was around the tunnel looking for an A.A. meeting was the suggestion in defense counsel's questions. We likewise find nothing impermissible in the prosecutor's argument that there was no evidence that Appellant was in that area for that purpose.

Contrary to Appellant's claim of error, we hold the prosecutor did not, even indirectly, call the jury's attention to Appellant's failure to testify as to "what he was there for." It is clear from a careful reading of the prosecutor's argument that he merely pointed out (a) there was no evidence that A.A. meetings were ever held in the physicians' office building or near the tunnel, and (b) the only suggestion Appellant was looking for such a meeting in that area was the suggestion in defense counsel's questions. Both observations were fair comment on the record.

Appellant's third point is denied, and the judgment is affirmed.

### Appeal 20177

Appellant's fourth point—the only claim of error in this appeal—avers he received ineffective assistance of counsel in the trial court when defense counsel "failed to offer a lesser included instruction for sexual abuse in the first degree." Appellant maintains he was thereby prejudiced, as such an instruction "would have resulted in significantly less punishment upon a conviction."

It is arguable that Appellant failed to plead this ground for relief in the motion court. His pro se motion alleged:

"CLAIM # 4

Movant was denied effective assistance of trial counsel ... in that Movant's counsel failed to request a verdict directing instruction for the lesser included offense of *attempted rape.*" (Emphasis added.)

Appellant was charged with, tried for, and convicted of, an attempt to commit forcible rape. He was not charged with committing forcible rape, hence "attempted rape" was not a lesser included offense in the charge on which he stood trial.

The lawyer appointed to represent Appellant in the motion court filed an amended motion on Appellant's behalf. However, the amended motion merely "incorporated [the pro se motion] by reference as if set forth fully and verbatim herein." The amended motion made no change in "Claim # 4."

The motion court addressed "Claim # 4" as pled in the pro se motion, finding:

"Movant claims that his attorney failed to request a verdict directing instruction for a lesser included offense of attempted rape. Instruction # 5 that was given being the verdict directing instructions [sic] was for attempted rape."

In the argument portion of his brief, Appellant proclaims the motion court clearly erred in the above finding, inasmuch as a segment of Appellant's pro se motion designated "Supporting Facts," which followed "Claim # 4," contained the following allegation:

"The evidence adduced at movant's trial, although arguably sufficient to support a charge of ATTEMPTED rape, would also equally support the lesser included offense of: SEXUAL ABUSE IN THE FIRST DEGREE; Sec. 566.100 RSMo. (1990)."

We note in passing that the above averment concedes the evidence was arguably sufficient to support a charge of attempted rape. That concession is obviously inconsistent with Appellant's first point which, as we have seen, declared that the evidence was insufficient to support a conviction for an attempt to commit forcible rape.

■ Surprisingly, the State's brief does not argue that Appellant failed, in the motion court, to plead the claim of ineffective assistance raised in his fourth point. Instead, the State maintains that sexual abuse in the first degree is not a lesser included offense in an attempt to commit forcible rape. Consequently, says the State, "Appellant was not entitled to have such an instruction given."

Inasmuch as the State tacitly concedes that Appellant, in the motion court, raised the claim of ineffective assistance set forth in his fourth point, we shall assume, *without deciding,* that he did so.

An attentive reader will recall that the crime of which Appellant was convicted occurred July 26, 1992. At that time, the version of § 566.100 in effect was the one in RSMo Cum.Supp.1991. It reads, in pertinent part:

"1. A person commits the crime of sexual abuse in the first degree if:

(1) He subjects another person to sexual contact without that person's consent by the use of forcible compulsion...."

Sexual contact was, at that time, defined by § 566.010(2), RSMo Cum.Supp.1991, which reads, in pertinent part:

" 'Sexual contact' means any touching of ... the breast of any female person, or any such touching through the clothing, for the purpose of arousing or gratifying sexual desire of any person[.]"

In *State v. Fields,* 739 S.W.2d 700 (Mo. banc 1987), the accused was convicted of rape and other crimes. He claimed on appeal that the trial court erred in refusing to instruct the jury that if it failed to find him guilty of rape, it must consider whether he is guilty of sexual abuse in the first degree.[5] *Id.* at 702–03.

The Supreme Court of Missouri rejected the claim of error, saying:

---

**5.** At the time of the crimes in *Fields,* the version of § 566.100 in effect was the version in

"Sexual abuse in the first ... degree, under the facts of this case, [is] not [a] lesser included [offense] of rape. The greater offense must include all the elements of the lesser offense, but if the lesser offense includes a necessary element not included in the greater offense, the lesser offense cannot be a lesser included offense. ...

This Court previously has stated that sexual abuse in the third degree is not a lesser included offense of rape. *State v. Harris,* 620 S.W.2d 349 (Mo. banc 1981). In *Harris,* this Court found that because sexual abuse required sexual contact and sexual contact included the mental element of 'for the purpose of arousing or gratifying sexual desire of any person' § 566.010.1(3), RSMo1978, and rape required no mental state, sexual abuse in the third degree was not a lesser included offense of rape. *Harris,* 620 S.W.2d at 354–55.

The same element of sexual contact is also present in a first degree sexual abuse, § 566.100.1(1), RSMo1978. ... Thus, following *Harris,* [that offense is] not [a] lesser included [offense] of rape." (Footnote omitted.)

*Fields,* 739 S.W.2d at 703[1] and [2].

The only difference between *Fields* and the instant case is that in *Fields* the accused was charged with, and convicted of, rape, whereas here Appellant was charged with, and convicted of, an attempt to commit forcible rape. That difference requires us to decide whether sexual abuse in the first degree, which is not (according to *Fields* ) a lesser included offense in the crime of rape, is a lesser included offense in the crime of attempting to commit forcible rape.

We hold it is not. As explained in *Harris* (the case on which *Fields* relied), in rape, purpose and motive are irrelevant. 620

S.W.2d at 355[11]. Therefore, held *Harris,* if the evidence shows the accused had sexual intercourse with the victim without her consent by the use of forcible compulsion, no intent is required other than that evidenced by the doing of the acts constituting the offense. *Id.*

In *State v. Parker,* 738 S.W.2d 566 (Mo. App.E.D.1987), decided three months before *Fields,* the appellate court held that § 564.011.1, RSMo1978,[6] requires that for a person to be guilty of an attempt to commit a crime, he must act with the purpose of committing the intended crime. *Id.* at 571. It follows from *Parker* that inasmuch as *Harris* holds the only mental element the State must prove to convict an accused of forcible rape is that his purpose was to engage in sexual intercourse with the victim without her consent by the use of forcible compulsion, the only mental element the State must prove to convict an accused of attempting to commit forcible rape is that he acted with the same purpose. That purpose is not the mental element required for a conviction of sexual abuse in the first degree, i.e., the purpose of arousing or gratifying sexual desire of any person.

*Parker* recognized the difference between the two mental elements. In *Parker,* the accused was convicted of attempted rape and other crimes. He claimed on appeal that attempted sexual abuse in the first degree is a lesser included offense in attempted rape, consequently the trial court erred in failing to so instruct. *Id.* at 570.

The appellate court disagreed, relying on *Harris.* Because *Harris* held sexual abuse in the first degree is not a lesser included offense in rape, the court in *Parker* reasoned that attempted sexual abuse in the first degree is not a lesser included offense in attempted rape. *Id.* at 571.[7]

Applying *Fields, Harris* and *Parker,* we hold sexual abuse in the first degree is not a

---

RSMo1978. Insofar as pertinent to the instant case, the relevant portion of the 1978 version of § 566.100 is identical to the relevant portion of § 566.100, RSMo Cum.Supp.1991, quoted above.

**6.** The version of § 564.011 in RSMo1978 remains unchanged.

**7.** *Parker* subsequently reached the appellate level twice in a post-conviction proceeding: *Parker v. State,* 785 S.W.2d 313 (Mo.App.E.D.1990), and

lesser included offense in an attempt to commit forcible rape. Accordingly, Appellant was not entitled to a verdict-directing instruction hypothesizing sexual abuse in the first degree.

■ Failure of an accused's lawyer to tender a jury instruction to which the accused is not entitled does not constitute ineffective assistance of counsel. *State v. Clark,* 914 S.W.2d 441, 443 (Mo.App.E.D.1996). Appellant's fourth point is denied, and the order of the motion court denying post-conviction relief is affirmed.

PREWITT, P.J., and SHRUM, C.J., concur.

*Parker v. State,* 836 S.W.2d 469 (Mo.App.E.D. 1992). The holdings for which we cite *Parker*

remained intact on those occasions.