**STATE of Missouri, Respondent,**

v.

**Jacob Montgomery CORWIN, Appellant.**

**No. SD 29422.**

Missouri Court of Appeals, Southern District, Division One.

Aug. 20, 2009.

Motion for Rehearing or Transfer Denied Sept. 14, 2009.

Application for Transfer Denied Nov. 17, 2009.

Melinda K. Pendergraph, Columbia, for Appellant.

Chris Koster, Atty. Gen., and Terrence M. Messonnier, Asst. Atty. Gen., Jefferson City, for Respondent.

ROBERT S. BARNEY, Judge.

Jacob Montgomery Corwin ("Appellant") appeals his conviction following a

jury trial for the unclassified felony of attempted forcible rape, a violation of section 566.030.[1] Having waived jury sentencing, Appellant was sentenced by the trial court to ten years in the Missouri Department of Corrections. He asserts three points of trial court error. We affirm.

Viewing the evidence in the light most favorable to the jury's verdict, *State v. Withrow*, 8 S.W.3d 75, 77 (Mo. banc 1999), the record reveals that on the evening of May 13, 2006, K.H. ("Victim"), a sophomore at Missouri State University, invited Appellant to join her and her friends at Harpo's Restaurant and Bar in Springfield, Missouri.[2] Appellant arrived at the bar and spent time with Victim and her friends. Victim described herself as being "friendly" toward Appellant and they had several conversations that evening. At some point in time while they were at Harpo's, Appellant began getting "touchy" with Victim by kissing the back of her neck. Victim related at trial that Appellant's actions made her uncomfortable. Victim also stated that she was consuming alcohol that evening and, although she was not intoxicated while at Harpo's, she was "feeling" the effects of the alcohol.[3]

Some time before midnight, Victim invited Appellant to join her and her friends at another bar and the group went to Jordan Creek. There Appellant tried to dance with Victim but she backed away from him and did not dance with him. She testified that Appellant's attempt to dance with her made her uncomfortable, but she was not alarmed by his behavior. Victim stated at trial that she had several more drinks while at Jordan Creek and estimated she

had consumed at least five rum and Diet Cokes as well as five shots of liquor that evening. She felt that when she left Jordan Creek she was "slightly" intoxicated.

Around 1:00 a.m. or 1:30 a.m., a sober driver from Victim's sorority transported Victim, Appellant, and several other people back to the university's campus. Appellant lived alone in a dormitory about a block down the street from Victim's sorority house. Victim testified that Appellant told her there was a party in his dormitory that night and Victim decided to go with Appellant to the party while the rest of the vehicle's passengers went to the sorority house. Once inside the dormitory, Victim discovered there was no party but she, nevertheless, went with Appellant to his room. Victim testified she planned on going back to the sorority house at that time but decided to spend the night in Appellant's room. Victim stated at that point she was moderately intoxicated and could feel the effects of the alcohol, but she did not feel like it affected her ability to perceive the events that followed.

While Appellant was in the bathroom, Victim, who was fully clothed, climbed into the only bed in his room and went to sleep. At some point thereafter Appellant got into bed with Victim and attempted to kiss her on the mouth. Victim pushed Appellant away and told him she just wanted to go to sleep. When Appellant, again, tried to kiss Victim she got out of bed and went to the bathroom. While Victim was in the bathroom, Appellant removed his own pants. When she returned to the bed and laid back down, Appellant tried to more forcefully kiss her. Victim told Appellant

---

1. All statutory references are to RSMo 2000 unless otherwise stated.

2. Victim knew Appellant from her freshman year of college when he was one of the resident assistants in her dormitory. Victim and

Appellant were friends and had never been romantically involved.

3. Victim's friend testified that Victim was a "little tipsy" at Harpo's.

to stop and that she did not want to kiss him. Appellant then "swung his body on top of [her]." Victim testified that he was holding her down with his arms on her shoulders and she "actually started to get scared...." She related he kept trying to kiss her and was saying things to her like " 'I've wanted to do this for so long; you don't know how much I like you....'" Appellant "somehow ... pulled [her] pants [and underwear] off [her], just ripped them kind of ..." and Victim began "moving all around" in an effort to get away from Appellant. Victim told Appellant to "please stop" and told him that if he did not stop she was going to scream as loud as she could. When he did not let her go, she then screamed. Appellant responded by saying " '[n]o one can hear you; no one cares.' "[4]

Victim continued "squirming all over the place" and Victim and Appellant somehow fell from the bed onto the floor. Once on the floor, Victim was in the "fetal position kind of and he was just pinning [her] down." She related she then said to him, " '[p]lease don't do this; I don't know why you're doing this," and Appellant responded by saying, "[i]f you don't let me do this, I'm going to break every single bone in your body." Victim then stated she "kind of gave up, and [she] was kind of preparing [her]self for whatever was going to

happen." She stated she again said to Appellant that she did not know why he was doing this to her and "all of a sudden he just got off of [her]."

At that point, Victim "immediately got up and started to run for the door, but [Appellant] was already standing at the door and wouldn't let [her] leave." She related she was crying and Appellant told her he would let her leave if she promised "not to tell anyone about this." He then told her to get her "shit" and leave his room. Victim put her clothes back on and "ran out" of his room to the elevator. She related she was scared and crying when she left the building to walk back to her sorority house.[5] Once back at her sorority house, her friends called the police and they responded to interview Victim. After being interviewed by the police, Victim was taken to the hospital by her friends. Victim had an injured left thumb and some visible red marks on her arms, legs, and hip which turned into bruises the following day.[6]

At some point later in the evening Appellant went to Ms. Leaver's apartment to talk to her. After speaking with Ms. Leaver in her bedroom, Ms. Johnston told Appellant to leave and related to him that she was going to call the police about what

---

4. While Appellant had Victim pinned to the bed, she related she heard Appellant's phone ring. The caller was Appellant's friend, Kelly Leaver ("Ms. Leaver"). Ms. Leaver testified that her phone call to Appellant had actually connected and that she was able to hear things taking place in his room. She testified at trial that she heard a female's voice on the other end of the line that sounded like she was in trouble and scared. She related she heard the girl say "stop" at least ten times and then she heard the girl say " 'stop, [Appellant], stop.' " Ms. Leaver was with her friend, Elizabeth Johnston ("Ms. Johnston"), when this occurred and she placed the call on speaker phone so that Ms. Johnston could

also hear what was going on in Appellant's room.

5. The man who worked at the front desk of Appellant's dormitory reported that he saw Appellant and Victim come into the building together earlier in the evening and he overheard Victim ask Appellant if he was intoxicated. He stated that ten to twenty minutes later Victim came out of the elevator by herself. He stated she was on her cell phone and she was crying and visibly upset.

6. Victim testified that she was "guessing" that the bruises were the result of the incident with Appellant.

she overheard on the telephone. Appellant said he would do it for her and called the police himself.[7]

When the officers arrived at Ms. Leaver's apartment, Appellant told them that he and Victim "were getting hot and heavy and then he stopped." Appellant was then arrested and transported to jail. When interviewed at the jail, Appellant again told officers that he and Victim had been out drinking that evening and ended up making out in his room. He said Victim then told him "no" and he was upset, but he stopped what he was doing. Appellant denied assaulting or attempting to rape Victim.

A trial was held on January 29, 2008, and February 1, 2008. Appellant did not testify on his own behalf. At the close of all the evidence, the jury found Appellant guilty of the crime charged and he was later sentenced by the trial court to ten years imprisonment. This appeal followed.

■ In his first point relied on, Appellant asserts the trial court plainly erred in sustaining the State's objection and in denying Appellant's request to admit "Exhibit A," which was "a printout of [Victim's] Facebook entries in which she admits drinking, having a rough night and unexplained bruises. . . ." Appellant argues his rights were violated by the trial court's ruling because Victim

> repeatedly minimized the amount of alcohol she drank, the effect of the alcohol on her ability to perceive and observe events. She suggested she did nothing to lead [Appellant] to believe she was interested in him. She 'guessed' she got her bruises from the struggle with [Ap-

pellant]. [Victim's] Facebook showed that she engaged in reckless, drunken behavior and had bruises to prove it, relevant to impeach her testimony that she was not drunk, her alcohol use did not affect her ability to perceive things and to test her knowledge of how she got the bruises on her body.

As part of his defense strategy, Appellant tried to suggest there were alternative sources for Victim's injuries including the notion that she might have fallen down while intoxicated and bruised herself. On cross-examination, Victim's testimony in relation to the bruises she sustained was that she was "guessing" that her bruises were the result of her struggle with Appellant. Despite this concession, Appellant's counsel then asked Victim if there were other occasions when she had gone out drinking and received bruises of unknown origin and she replied she did not know. In support of his theory and in an effort to impeach Victim, Appellant attempted to have several pages of Victim's Facebook profile admitted into evidence. One of the entries on Victim's Facebook page, which was written by Victim to a friend on February 5, 2007, stated: "I didn't pass out I just took a little cat nap to get me through the night! I feel A LOT better now th[a]n I did when I first woke up ... it was a pretty rough night and I have the bruises to prove it." In addition to the previous entry, Appellant also attempted to have other entries admitted into evidence which referred to drinking and partying by Victim as well as references to sex and several pictures of Victim drinking and dancing with young men. An offer of proof was

7. The officer that responded to Ms. Leaver's apartment testified that when he interviewed Appellant his speech was slurred, he appeared to be intoxicated, he smelled like alcohol and admitted he had been drinking. He further related that Appellant had a difficult time answering his questions and that he made "off-the-wall" comments that "weren't even close to the questions" asked by the officers.

made by Appellant;[8] however, the State's objection to this evidence was sustained.

■ At the outset, it is important to note that although this allegation of error was argued before the trial court and an offer of proof was made by Appellant's counsel, this allegation was not included in Appellant's motion for new trial. We note that in order to preserve such issues for appeal in a jury tried case the issue must be presented in a motion for new trial. Rule 29.11(d).[9] "Failure to include an allegation of error in a motion for new trial limits appellate review to plain error." *State v. Brown,* 97 S.W.3d 97, 100 (Mo. App.2002). Accordingly, Appellant requests plain error review.

"Plain error review under Rule 30.20 is used sparingly and is limited to those cases where there is a strong, clear demonstration of manifest injustice or miscarriage of justice." *State v. Spry,* 252 S.W.3d 261, 266 (Mo.App.2008). Plain error claims are reviewed "under a two-prong standard." *State v. Roper,* 136 S.W.3d 891, 900 (Mo.App.2004). "In the first prong, we determine whether there is, indeed, plain error, which is error that is 'evident, obvious, and clear.' " *Id.* (quoting *State v. Scurlock,* 998 S.W.2d 578, 586 (Mo.App.1999)). "If so, then we look to the second prong of the analysis, which considers whether a manifest injustice or miscarriage of justice has, indeed, occurred as a result of the error." *Id.* If Appellant cannot get past the first step, this Court should refrain from reviewing his claim. *State v. Brown,* 902 S.W.2d 278, 284 (Mo. banc 1995). "A criminal defendant seeking plain error review bears the burden of showing that plain error occurred and that it resulted in a manifest injustice or miscarriage of justice." *Roper,* 136 S.W.3d at 900. "The outcome of plain error review depends heavily on the specific facts and circumstances of each case." *Id.*

"Trial courts retain broad discretion over issues of relevancy and admissibility of evidence, and we will not interfere with those decisions unless there is a clear showing of abuse of discretion." *State v. Uka,* 25 S.W.3d 624, 627 (Mo.App.2000). "We review trial court decisions regarding the admissibility of evidence for prejudice, not mere error, and will reverse only if the error was so prejudicial that it deprived the defendant of a fair trial." *Id.*

■ We initially observe that "[l]ike other witnesses, the complaining witness in a sex offense case may be impeached by evidence that her general reputation for truth and veracity is bad but not ordinarily by proof of specific acts of misconduct."[10]

---

8. In the offer of proof, Victim confirmed that she wrote the comment at issue on her Facebook profile, but she stated she was "trying to be funny" and she did not "think that is what happened."

9. All rule references are to Missouri Court Rules (2008).

10. "It has long been recognized that defendants in rape or sexual assault cases should be allowed to introduce evidence that the prosecuting witness's story is a fabrication." *State v. J.L.S.,* 259 S.W.3d 39, 45 (Mo.App. 2008); *see also State v. Long,* 140 S.W.3d 27, 30 (Mo. banc 2004) (holding that extrinsic evidence of prior, specific acts of misconduct is generally inadmissible and a witness may only be impeached with extrinsic evidence in cases where the prosecuting witness has made prior false allegations). Further, "the general ban on impeachment of witnesses through proof of prior unconvicted misconduct has three exceptions: where the inquiry shows (1) a specific interest; (2) a possible motivation to testify favorably for the State; or (3) an expectation of leniency." *State v. Wolfe,* 13 S.W.3d 248, 258 (Mo. banc 2000). None of these foregoing exceptions are applicable here.

*J.L.S.*, 259 S.W.3d at 45. " 'Impeaching testimony should be confined to the real and ultimate object of the inquiry, which is the reputation of the witness for truth and veracity.' " *Id.* (quoting *Wolfe*, 13 S.W.3d at 258).

Here, the information contained in Exhibit A went beyond any evidence even tangentially related to events of the night in question and detailed prior instances of what could be termed misconduct on the part of Victim. Exhibit A contained quotes, information, photographs, and comments about almost all aspects of Victim's life including references to partying, sex, drinking, schoolwork, and at least one sexually suggestive photograph. None of this information is legally relevant to the fact that Appellant was charged with the attempted forcible rape of Victim. Even the quote at issue relating to an instance some nine months after the event in question where Victim might have received bruises after an evening out on the town is legally irrelevant and is not directed at Victim's reputation for truth and veracity. Evidence that Victim had been bruised on another occasion when intoxicated neither proves nor disproves that her bruises on the day of the attempted rape were from an alcohol related accident, instead of Appellant's violent actions toward her. It was permissible for Appellant's counsel to ask Victim whether she had received bruises in the past after a night of drinking; however, her Facebook profile page was not admissible to challenge her answer on this collateral matter. *See State v. Foster*, 854 S.W.2d 1, 8 (Mo.App.1993). Appellant did not meet his burden of proving error "that is 'evident, obvious, and clear.' " *Roper*, 136 S.W.3d at 900 (quoting *Scurlock*, 998 S.W.2d at 586. Point I is denied.

■ In his second point relied on, Appellant maintains the trial court erred in overruling his request for a mistrial in relation to the testimony of Ms. Johnston, who was at Ms. Leaver's apartment when Appellant came over after the incident with Victim.

At trial, Ms. Johnston was questioned about what happened at Ms. Leaver's apartment on the night at issue. Ms. Johnston related that after Appellant arrived he and Ms. Leaver went into the bedroom to talk. Ms. Johnston stated that she turned the TV off in order to "hear through the wall; so [she] was listening to what [Appellant] was saying" to Ms. Leaver. She overheard Appellant "[j]ust saying outrageous things like, 'I'm so glad that you take me for who I am,' talking about his dad and how he and his dad did drugs together; his dad sold him drugs." Appellant objected to this testimony and, after approaching the bench, requested a mistrial on the basis of Ms. Johnston's suggestion that Appellant used drugs. The State asserted it had never heard this information before from Ms. Johnston, did not know she intended to make such a suggestion, and felt Appellant's objection was warranted, but felt a mistrial was an extreme remedy. The trial court agreed with the State and denied the request for a mistrial, but ordered Ms. Johnston's answer stricken and asked the jury to disregard the answer.

■ This Court reviews a trial court's ruling on a request for a mistrial under the abuse of discretion standard. *State v. Jones*, 134 S.W.3d 706, 717 (Mo.App.2004). " 'We will not reverse a trial court's exercise of discretion absent a showing of clear abuse and substantial prejudice resulting to the defendant.' " *State v. Mahoney*, 70 S.W.3d 601, 606 (Mo.App.2002) (quoting *State v. Webber*, 982 S.W.2d 317, 323 (Mo. App.1998)). " 'Judicial discretion is deemed abused only when a trial court's ruling is clearly against the logic of the

circumstances then before it and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration.'" *Jones,* 134 S.W.3d at 717 (quoting *State v. Neff,* 978 S.W.2d 341, 345 (Mo. banc 1998)). "'The declaration of a mistrial is a drastic remedy that should be employed only in extraordinary circumstances in which prejudice to the defendant can be removed in no other way.'" *Jones,* 134 S.W.3d at 717 (quoting *State v. Webber,* 982 S.W.2d 317, 322 (Mo.App.1998)).

 "It is generally recognized that a criminal defendant has a right to be tried only for the offense for which he is charged." *State v. Johnson,* 161 S.W.3d 920, 924 (Mo.App.2005). "'The general rule concerning the admission of evidence of uncharged crimes, wrongs, or acts is that evidence of prior uncharged misconduct is not admissible for the purpose of showing the propensity of the defendant to commit such crimes.'" *Id.* (quoting *State v. Burns,* 978 S.W.2d 759, 761 (Mo. banc 1998)). "To violate the rule prohibiting evidence of other crimes or misconduct by the accused, the evidence must show the accused committed, was accused of, was convicted of, or was definitely associated with, the other crimes or misconduct." *State v. Ponder,* 950 S.W.2d 900, 911–12 (Mo.App.1997).

 With that being said, "[i]t is not an uncommon occurrence at trial for a witness to unexpectedly volunteer an inadmissible statement." *Mahoney,* 70 S.W.3d at 606. "Since the trial court has observed the event that led to the request for a mistrial, it is in the best position to determine whether the incident had a prejudicial effect on the jury." *Id.* In determining whether the uninvited statement of a witness had a prejudicial effect, we consider five factors:

1) whether the statement was, in fact, voluntary and unresponsive to the prosecutor's questioning or caused by the prosecutor; 2) whether the statement was singular and isolated, and whether it was emphasized or magnified by the prosecution; 3) whether the remarks were vague and indefinite, or whether they made specific reference to crimes committed by the accused; 4) whether the court promptly sustained defense counsel's objection to the statement and instructed the jury to disregard the volunteered statement; and 5) whether, in view of the other evidence presented and the strength of the State's case, it appeared that the comment played a decisive role in the determination of guilt.

*State v. Ward,* 242 S.W.3d 698, 704–05 (Mo. banc 2008). "Further, when 'a witness volunteers inadmissible information, the trial court is in the best position to determine what measures, if any, are necessary to cure that effect.'" *Mahoney,* 70 S.W.3d at 606 (quoting *State v. Burch,* 939 S.W.2d 525, 528 (Mo.App.1997)).

Considering the five factors set out in *Ward,* it is clear that there was no prejudicial effect on Appellant's case by Ms. Johnston's statement and a mistrial was not warranted. First, Ms. Johnston's response was plainly "voluntary and unresponsive to the prosecutor's questioning or caused by the prosecutor. . . ." *Ward,* 242 S.W.3d at 705. The prosecutor told the trial court that he had never heard Ms. Johnston make those comments before and that he was unaware of these facts until spoken by Ms. Johnston on the stand at trial. By virtue of its actions, we infer that the trial court accepted this explanation as being credible. Ms. Johnston's response to the prosecutor's question was volunteered by her without any prompting from the State. Second, "the statement was singular and isolated" and "was [not]

emphasized or magnified by the prosecution." *Id.* This was the only reference to drug use by Appellant made during the trial and Appellant objected to the statement immediately such that it was not magnified in the eyes of the jury. Further, all discussions related to the objection were held outside of the jury's presence. Third, Ms. Johnston's "remarks were vague and indefinite...." *Id.* Ms. Johnston reported she was listening to Appellant speak with Ms. Leaver through a wall and gave a vague recitation about some of the "outrageous things" she overheard him saying. She didn't state a specific time Appellant had done drugs and she merely recited that Appellant said he had done drugs at some unspecified point in the past. Fourth, the trial "court promptly sustained defense counsel's objection to the statement and instructed the jury to disregard the volunteered statement." *Id.* As soon as Appellant objected to the statement, a conference was held at the bench and after a short discussion the trial court announced it was striking the answer. The jury was then instructed to disregard the answer. Fifth, "in view of the other evidence presented and the strength of the State's case, it appear[s] that the comment [did not play] a decisive role in the determination of [Appellant's] guilt." *Id.* As discussed in Point III below, there was substantial and sufficient evidence to support Victim's version of events and to convict Appellant of the crime charged. There was no prejudicial effect to the statements uttered by Ms. Johnston. Further, the trial court is in the best position to determine how to deal with such statements and the trial court did not abuse its discretion in denying Appellant's request for a mistrial. *See Mahoney,* 70 S.W.3d at 607. Point II is denied.

 In his third point relied on, Appellant asserts the trial court erred in overruling his oral motions for judgment of acquittal, accepting the jury's verdict and sentencing Appellant on the charge, because "the evidence did not prove beyond a reasonable doubt that [Appellant] had the purpose to have nonconsensual sexual intercourse with [Victim]."

This Court reviews "'the denial of a motion for acquittal to determine if the State adduced sufficient evidence to make a submissible case.'" *State v. Baumann,* 217 S.W.3d 914, 917 (Mo.App.2007) (quoting *State v. Howard,* 973 S.W.2d 902, 906 (Mo.App.1998)); *see State v. Young,* 139 S.W.3d 194, 196 (Mo.App.2004). "On appeal from a jury-tried criminal case, it is not the role of a reviewing court to weigh the evidence, but rather, it is the function of the jury to determine beyond a reasonable doubt whether defendant was guilty of the offense charged." *State v. Collins,* 188 S.W.3d 69, 73 (Mo.App.2006).

In reviewing the sufficiency of the evidence, this Court "must examine the elements of the crime and consider each in turn; reviewing the evidence in the light most favorable to the judgment; disregarding any contrary evidence; and granting the State all reasonable inferences from the evidence." *State v. Davis,* 219 S.W.3d 863, 866 (Mo.App.2007). "We defer to the superior position of the jury to assess the credibility of witnesses and the weight and value of their testimony." *Id.* "We [only] consider whether the evidence was sufficient to make a submissible case from which a rational trier of fact could have found the defendant guilty beyond a reasonable doubt of the crimes charged." *Collins,* 188 S.W.3d at 73.

Under section 566.030 a "person commits the crime of forcible rape if such person has sexual intercourse with another person by the use of forcible compulsion."

As defined in section 556.061(12), RSMo Cum.Supp.2006, " '[f]orcible compulsion' means either: (a) [p]hysical force that overcomes reasonable resistance; or (b) [a] threat, express or implied, that places a person in reasonable fear of death, serious physical injury or kidnapping of such person or another person. . . ."

Here, Appellant was charged with attempted forcible rape. Section 564.011.1 sets out that

> [a] person is guilty of attempt to commit an offense when, with the purpose of committing the offense, he does any act which is a substantial step towards the commission of the offense. A 'substantial step' is conduct which is strongly corroborative of the firmness of the actor's purpose to complete the commission of the offense.

The attempt statute " 'does not require that an actual or specific attempt be made to perform each and every element of the crime.' " [11] *State v. Bates,* 70 S.W.3d 532, 538 (Mo.App.2002) (quoting *State v. Bolen,* 731 S.W.2d 453, 457 (Mo.App.1987)). " 'What act or conduct will constitute a substantial step will depend on the facts of the particular case.' " *Young,* 139 S.W.3d at 196 (quoting *Bates,* 70 S.W.3d at 535).

Here, there was sufficient evidence to prove beyond a reasonable doubt that Appellant attempted to forcibly rape Victim. Victim testified she did not consent to Appellant's actions and told him to "stop" numerous times. She stated she screamed on one occasion and told him "no" repeatedly. She questioned him aloud as to why he was acting that way toward her and she testified that she made it clear she did not want to kiss or engage in any sexual acts with him. Despite her protests, Appellant continued to try to kiss her, he got on top of her, and he held her down forcefully with his hands on her shoulders. Appellant then ripped Victim's pants and underwear off her body and, at some point in time, removed his own boxer shorts. He also threatened to "break every single bone in [her] body" if she did not stop resisting his advances; made other remarks which scared Victim; and put her in fear for her safety. Victim testified that she struggled with Appellant by writhing around and kicking her legs in an attempt to get him to stop his behavior. Even when Victim and Appellant fell from the bed onto the floor Appellant continued to forcefully restrain her. Once Appellant freed Victim he threatened her not to tell anyone about what had occurred, but he ultimately allowed her to leave his room.

Additionally, Victim's testimony is corroborated by the testimony of both Ms. Leaver and Ms. Johnston, who overheard a portion of the incident by telephone. Both women testified to hearing a frightened female voice repeatedly saying "no" and "stop" in conjunction with Appellant's name in excess of a dozen times.

The elicited evidence shows that Appellant's conduct was " 'strongly corroborative of the firmness of his purpose to complete the commission of the offense [of forcible rape].' " *Young,* 139 S.W.3d at 198 (quoting § 564.011.1). Therefore, his conduct constituted a substantial step towards the

---

11. As noted by the Supreme Court in *Withrow,* 8 S.W.3d at 78, common law attempt had four separate elements: "(1) the intent to commit a crime; (2) an overt act toward its commission; (3) failure of consummation; and (4) the apparent possibility of commission." With the enactment of section 564.011, effective January 1, 1979, our high court made clear that "[t]o the extent cases have incorporated the four common law elements into the substantial step analysis, they should no longer be followed." *Id.* at 79. "Missouri now recognizes only one type of attempt, i.e., section 564.011." *Young,* 139 S.W.3d at 198.

commission of the crime of forcible rape. *See State v. Gray,* 923 S.W.2d 929, 932, 935 (Mo.App.1996); (holding there was a substantial step toward the commission of the crime of attempted forcible rape where the defendant wrestled the non-consenting victim to the floor, grabbed her breasts, and attempted to remove her shirt during a five to ten minute struggle). There was sufficient evidence to support the trial court's judgment and the trial court did not err in denying Appellant's "motions for judgment of acquittal," in accepting the jury's verdict, and in sentencing Appellant on the charge of attempted forcible rape. Point III is denied.

The judgment of the trial court is affirmed.

BATES, P.J., and BURRELL, J., concur.