**STATE of Missouri, Respondent,**

v.

**Ronald T. CLARK, Appellant.**

**Ronald T. CLARK, Appellant,**

v.

**STATE of Missouri, Respondent.**

Nos. 20492, 22219.

Missouri Court of Appeals,
Southern District,
Division One.

Sept. 8, 1998.

Ellen H. Flottman, Asst. Public Defender, Columbia, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Breck K. Burgess, Asst. Atty. Gen., Jefferson City, for respondent.

CROW, Judge.

A jury found Appellant, Ronald T. Clark, guilty of two felonies: Count I, murder in the first degree, § 565.020;[1] Count II, armed criminal action, § 571.015.

The jury assessed punishment at imprisonment for life without eligibility for probation or parole on Count I, and imprisonment for ten years on Count II.[2] The trial court entered judgment per the verdicts, except the court sentenced Appellant to only three years' imprisonment on Count II.[3] Appellant brings appeal 20492 from that judgment.

---

1. References to statutes are to RSMo 1994.

2. We glean this information from two sources: the verdicts as they appear in the legal file and a notation on the trial court's docket sheet ostensibly entered the date of the verdicts. The transcript shows the verdicts were returned and the

jurors polled; however, no verbatim recitation of the verdicts appears in the transcript.

3. The only explanation in the record for the three year sentence is a colloquy that occurred at time of sentencing (55 days after the verdicts). After the trial court pronounced sentence in accordance with the verdict on Count I, the prosecutor

While appeal 20492 was pending, Appellant filed a motion to vacate the judgment and sentences per Rule 29.15.[4] The motion court denied relief after an evidentiary hearing. Appellant brings appeal 22219 from the motion court's judgment.

This court consolidated the appeals, Rule 29.15($l$), but addresses them separately in this opinion.

### Appeal 20492

Appellant's first point relied on—the only claim of error in appeal 20492—avers the trial court wrongly denied a motion for mistrial by Appellant's lawyer "when the State failed to timely disclose [the] victim['s] coat." Adjudicating that issue requires an account of how it arose at trial.

The victim was Alvin Ray Spence, age 21, referred to by several witnesses as "Ray." For convenience, this opinion adopts that designation.

The fatal incident occurred November 8, 1994, in Charleston at a site identified by one witness as the "Bowden Center," by another witness as the "civic center," and by several other witnesses as "Lincoln School."[5] This opinion adopts the latter designation.

The State's theory, as outlined by the prosecutor in opening statement, was that Appellant and Ray "had a few words, and then they began to wrestle." After the grapple ended, Appellant departed. He returned a few minutes later and shot Ray thrice with a ".380 semi-automatic."

Continuing, the prosecutor told the jurors that investigators took custody of Appellant "about twenty minutes after the shooting" and questioned him. Appellant told the in-

vestigators that Ray had a gun; Appellant "grabbed Ray's hand and turned that gun back around on Ray, and that's when the gun went off [.]" The prosecutor asserted "forensic evidence" did not support Appellant's "story." According to the prosecutor, laboratory tests revealed "there was no gun shot residues on [Ray's] clothes to show he had been shot at close range."

Appellant's theory, as outlined by his lawyer ("Defense Counsel") in opening statement, was that Appellant acted in self-defense. Defense Counsel told the jurors that during the "wrestling match," Appellant saw a gun in Ray's hand, aimed at Appellant's chest. Appellant, in fear for his life, grabbed the gun. A struggle ensued, during which Appellant heard a shot. Appellant ceased the struggle and departed. According to Defense Counsel, Appellant "believes he heard shots as he was leaving."

Witnesses for the State testified that around 8:00 p.m. on the fatal date, Appellant and Ray were wrestling on "the concrete in front of the doors of Lincoln School." After spectators separated the duo, Appellant left the site. He returned a few minutes later and shot Ray three times with a handgun.

During cross-examination of the State's first witness, Michael Terry Kellum, Defense Counsel asked whether he (Kellum) saw three wounds on Ray. Kellum responded: "[W]hat am I supposed to do? Take off his shirt and see how many times he got shot?"

Later in the cross-examination, this dialogue occurred:

"Q What was Ray wearing that night?

reminded the trial court about Count II, stating: "I believe they gave him a three year sentence." Without further ceremony (and evidently without reviewing the verdict on Count II), the trial court sentenced Appellant to three years' imprisonment on Count II. The formal judgment, bearing a signature appearing to be that of the trial court, shows the sentences are to be served concurrently. Understandably, Appellant assigns no error about the anomaly of receiving three years instead of ten on Count II.

**4.** Rule 29.15(m), Missouri Rules of Criminal Procedure (1998), provides that if sentence is pronounced prior to January 1, 1996, post-convic-

tion relief shall be governed by the provisions of Rule 29.15 in effect on the date the motion was filed or December 31, 1995, whichever is earlier. Appellant was sentenced September 14, 1995; his motion for post-conviction relief was filed March 29, 1996. Consequently, the version of Rule 29.15 in Missouri Rules of Criminal Procedure (1995) applies to Appellant's proceeding for post-conviction relief. References to Rule 29.15 in this opinion are to that version.

**5.** It is inferable from the testimony that the site had once been a school and had been converted to a public recreational and social facility.

A  I saw him in a white T-shirt and some black like thin sweats....

Q  How about his coat?

A  Didn't have a coat on.

Q  Didn't see a coat?

A  No.

Q  And there wasn't a coat there after it was all over, there was?

A  His brother had the coat.

Q  His brother Corey?

A  His brother had it at the time.

Q  So there was a coat there that belonged to [Ray]?

....

A  Yes."

During Defense Counsel's cross-examination of the State's second witness, Marcus Williams, this dialogue occurred:

"Q  At the time that you saw [Ray], what was he wearing that night?

A  A white T-shirt, and some dark blue jeans.

....

Q  How about a jacket?

A  I think had blue and black jacket on, Fila.

....

Q  So he had on white shirt and pants and a Fila jacket?

A  Yes."

During redirect examination of Williams by the prosecutor, the transcript shows this:

"Q  ....  Do you remember if [Ray] had that jacket on when he was shot?

A  No, he didn't have it on when he was shot.

Q  Why do you say that?

A  Because he was laying on the ground, and he didn't have it on.

Q  Do you know who had the jacket at that time?

A  No."

During cross-examination of the State's third witness, Lamonte Cortez Williams, Defense Counsel asked what Ray was wearing. Williams answered: "Only thing I know, Ray had on a coat, and when [Appellant] came and put the gun on Ray, he took his coat off." Cross-examination continued:

"Q  Did you see what happened to that coat?

A  A friend of his got it.

Q  A friend of his carried it off?

A  Yes.

Q  So who was that friend?

A  Cedric Rogers."

The State's fourth witness was Corey Dontrell Spence, Ray's younger brother. On direct examination, the following testimony was adduced:

"Q  How was Ray dressed during this time?

A  He had on black sweats and white T-shirt....

Q  Where was his jacket?

A  He had it on at the time.

Q  What happened to that jacket?

A  After [Appellant] came back and Ray saw [Appellant] pull over, Ray took the jacket off and handed it to me and I put it on.

....

Q  Did you give it to anybody?

A  No.

Q  Didn't give it to anybody that night?

A  No.

....

Q  Describe the jacket for me....

A  Black and blue Fila jacket."

Defense Counsel's cross-examination of Corey Spence included this:

"Q  And [Ray] had [the coat] on at the time of the shooting incident;  didn't he?

A  No. I had the coat on."

During cross-examination of the State's fifth witness, Ader B. Jackson, this colloquy occurred:

"Q  When you saw Ray that night, he had on a jacket;  didn't he?

A  When I saw Ray, he didn't have a jacket on."

Following that exchange, witness Jackson admitted she testified at an earlier proceeding at which Defense Counsel asked her how

Ray was dressed. Jackson acknowledged she "said he had a jacket" on that occasion.

The State's sixth witness was Talisha Haynes. Defense Counsel's cross-examination of her included this:

"Q What was Ray wearing that night?

A A white shirt and some ... silky sweat pants.

Q How about a dark jacket?

A No.

Q Never saw it?

A Saw his younger brother had it on.

Q So the whole night that you were there with Ray Spence, he never ever had on a jacket of any kind?

A Not that I know of.

Q What happened to that jacket?

A I don't know."

After the shooting, Ray was taken by ambulance to a hospital. He was dead on arrival.

The coroner of Mississippi County went to the hospital, examined the corpse, and "package[d] up" Ray's clothing. The coroner's testimony:

"Q What clothes?

A Sweat pants, I believe a T-shirt, socks, tennis shoes."

Andy Todd Wagoner, a firearms examiner at the Southeast Missouri Regional Crime Laboratory at Cape Girardeau, testified he examined Ray's shirt, "since it was our information [Ray] was shot in the upper torso area." Wagoner's testimony continued:

"Q What did you look for?

A Looked for the presence of lead or stippling or powder .... the actual discharge of a firearm is a reaction. You have a lot of powder that isn't burned. It kind of has a shot gun effect at close range where it is pushed out into the clothing or into the skin or into anything that is close to it, and it is deposited like that, also you should have possibility of a sooting effect from the burned powder.

Q At what distance would you expect to find that, Andy?

A Distance is going to depend on the firearm and the ammunition, whether it is a charge round that has an excessive amount of powder in it, that is going to have bearing, on whether or not it is a gun that has a long barrel, that is going to have some bearing on how far out it is going to be deposited.

. . . .

Q In this particular case, would you have expected to have found stippling, burnt powder, things of that nature on that T-shirt if that had been a close shot?

A I would expect to see something within—oh, I would say probably within a couple feet, yes.

Q Anything outside of that, would you expect to see something?

A Without having the actual gun to do the testing with,[6] it would be hard to say, but ... I would say six feet, you wouldn't see it."

Wagoner avowed he found no lead, copper or unburned powder on Ray's shirt.

Defense Counsel's cross-examination of Wagoner included this:

"Q ... you examined no coat of any kind as reported to have been on ... Ray ... ?

A No, I didn't.

Q So you don't know what, if any, copper, lead or antimony would be on a coat if [Ray] was wearing a coat?

A That's correct.

Q But you would agree ... that a coat would virtually block out any lead, copper or antimony, what have you, depending on the thickness of the coat?

A Certainly possible."

The first witness presented by Defense Counsel was Carlos Clemons; he testified on the third day of trial.

Clemons recounted that sometime between 4:00 and 5:00 p.m. on the fatal date, he saw Ray at Lincoln School. According to Clemons, Ray "pulled a weapon" from "inside of his jacket." Asked to describe the jacket, Clemons responded: "Blue and black Fila."

6. This court infers from the record that investigators never found the gun.

The prosecutor's cross-examination of Clemons began thus:

"Q Carlos, let me hand you this jacket. Does that look familiar to you?

A Yes, sir.

Q You saw where I got it, didn't you?

A Yes, sir.

Q Who did I get it from?

A (Indicating), between the light skinny girl right there.

[Defense Counsel]: Your Honor, I am going to object to use of a jacket as a prop. It has not been disclosed there is a jacket and there has been no foundation that there is any jacket that has any relevancy at this stage.

THE COURT: Objection overruled.

Q Why is that jacket familiar to you?

A This is the jacket he had on.

Q That is the jacket Ray ... had on at this time?

A Yes, sir.

Q No question in your mind about that?

A No question."

Later, Defense Counsel presented Appellant as a witness. Appellant's direct examination included this:

"Q You saw earlier today the prosecution get this coat from someone and bring it up here and ask if this was the coat that [Ray] had on?

A No, sir, that's not the coat.

Q Does it look like the coat?

A No, sir. It looks like it, but it was older than that. It was faded.

Q What's the difference between this coat and the coat that he had on?

A The coat that he had on was more lighter than that coat right there.

Q Were the colors the same?

A Yes, sir.

Q What kind of coat is this?

A A Fila."

After Defense Counsel completed the presentation of Appellant's evidence, the prosecutor announced that one witness the State would present in rebuttal was C.C. Rogers.

Outside the hearing of the jury, the prosecutor told the trial court and Defense Counsel:

"C. C. Rogers who owned the coat that Ray ... had will testify that he got the coat at the site, that he gave the coat originally to Ray a week before the shooting, that he got the coat from the site. He took the coat to the hospital with him, and because it was Ray, his friend, who he had given the coat to that was killed, that he gave to [sic] it to his little brother, and [Ray's mother] will get on the stand and say yes, that's the coat that was given to the brother and she's had it ever since."

Defense Counsel responded:

"As I recall ... the State's evidence, Corey Spence testified he had the coat at the scene and removed it. One of the Williams testified in the State's case that it was in fact Mr. C. C. Rogers who removed it from the scene. Ownership, I don't remember it being mentioned. Judge, that's not proper rebuttal. It has been brought out in the State's case."

The prosecutor replied:

"We did not have a coat to show them. Now we have a coat, so our case in chief didn't have that."

The trial court announced that the proffered testimony would be allowed.

Cedric C. Rogers was the second rebuttal witness presented by the State. It is evident from Rogers's testimony that he was wearing a jacket on the witness stand. The prosecutor asked Rogers to tell the jurors about the jacket. Rogers explained he bought it "a year or two" before the trial.[7] Rogers added that he gave the jacket to Ray "around November 1st or November 2nd [1994]."

Rogers avowed he was at Lincoln School when the shooting occurred, but he did not see it because he was in a car. Upon hearing the shots, Rogers got out and saw Ray "lying down." Rogers's testimony continued:

"I seen this little guy holding my coat, and I took it from him. I put it in my car, and that's when I drove to the hospital, and that's when they told me he didn't make it.

7. Trial occurred July 18–21, 1995.

I kept it in my trunk and told an old boy I didn't want it, so I gave it to his little brother Corey."

Asked whether there was any damage to the jacket, Rogers answered: "No, sir .... it's like new."

Defense Counsel's cross-examination of Rogers included this:

"Q Your testimony is you took that coat from Lincoln School?

A Yes, it was mine.... I drove the coat to the hospital.

Q In fact, you told our investigator that, Mrs. Bollinger, on the 17th of January; didn't you?

A That I took the coat to the hospital, yes."

At the conclusion of Rogers's testimony, the prosecutor offered the coat as Exhibit 18.

Defense Counsel protested: "Your Honor, I would object to it. If they had it in the trial, they didn't disclose it to us. They brought it into trial from the audience. It is not relevant."

The trial court received Exhibit 18 in evidence.

The prosecutor then presented Ray's mother as a witness. She identified Exhibit 18 as Ray's jacket. She explained that "C. C." gave it to Ray a week or two before Ray was killed. Her testimony continued:

"Q Where did you get it today?

A I got it from home. It has been home ever since he got killed."

Defense Counsel's cross-examination of Ray's mother produced this dialogue:

"Q Ma'am, since November 8, 1994, since that took place, you just brought this jacket up here today?

A They asked me to bring it. Someone talked about the jacket supposed to have bullet holes in it and—

Q Who asked you to bring it?

A The prosecuting attorney."

During a recess immediately following the above testimony, Defense Counsel stated:

"Judge, at this time I would ask for a mistrial on the basis that the prosecuting

attorney's office has brought in essentially a red herring that they had knowledge, they asked that this coat be brought for trial. It was given out of the audience. We were given no notice. It is improper, prejudicial and I will ask for a mistrial."

The prosecutor responded:

" ... the defense has developed the red herring throughout this entire trial, in the cross examination of the people that witnessed the shooting, in the ... testimony of Andy Wagoner. They are the ones that have made this an issue, not the State in any way, shape or form in the first place. In the second place, anticipating that it was going to be an issue after it had been raised on the second day of trial, yes, indeed, we asked her to bring it in here."

The trial court denied the motion for mistrial.

Appellant's first point relied on:

"The trial court erred in overruling Defense Counsel's motion for a mistrial when the State failed to timely disclose [Ray's] coat because this violated [Appellant's] rights to due process, a fair trial and to present a defense, as guaranteed by [sundry federal and state constitutional provisions] in that nothing short of a mistrial could remove the prejudice resulting from the State's failure to disclose this evidence before trial since Defense Counsel detrimentally relied upon the State's discovery to prepare a strategy for trial and begin [sic] presenting that defense strategy only to have it put into doubt upon the prosecutor's suddenly coming up with the coat in the middle of the defense case."

In support of the above point, Appellant cites *State v. Varner*, 837 S.W.2d 44 (Mo. App. E.D.1992), and *State v. Scott*, 943 S.W.2d 730 (Mo.App. W.D.1997). Neither is applicable. *Varner* involved the prosecutor's failure to disclose evidence which the prosecutor presented in the State's case-in-chief. *Scott* involved the prosecutor's failure to disclose inculpatory statements of the accused.

■ In the instant case, it is obvious that Exhibit 18 was not an item of evidence the prosecutor intended to introduce in the State's case-in-chief. The State's theory, as

supported by its witnesses, was that Ray was not wearing a coat when he was shot. Six State's witnesses testified to that effect: Michael Kellum, Marcus Williams, Lamonte Williams, Corey Spence, Ader Jackson and Talisha Haynes. No State's witness testified otherwise.

Furthermore, the clothing taken from Ray's corpse by the coroner and submitted for laboratory examination did not include Exhibit 18.

Defense Counsel, during cross-examination of the first six State's witnesses, endeavored to elicit testimony that Ray was wearing a coat at the time of the shooting, but those witnesses rejected that notion. However, Defense Counsel's questioning obviously alerted the prosecutor that Defense Counsel hoped to present evidence supporting that hypothesis. Consequently, as explained by the prosecutor to the trial court, when Defense Counsel's strategy emerged on the second day of trial, the prosecutor asked Ray's mother to bring the coat to court. Had the prosecutor, prior to trial, considered Exhibit 18 an item of evidentiary value, it is inferable the prosecutor would have endeavored to ascertain its whereabouts, obtain possession, and submit it for laboratory analysis.

Additionally, witness Rogers, during cross-examination by Defense Counsel, revealed he (Rogers) told Defense Counsel's investigator on January 17, 1995 (six months before trial), that he (Rogers) took the coat to the hospital the night Ray was shot. Consequently, had Defense Counsel wanted to find the coat, he was aware long before trial that Rogers claimed to know the coat's whereabouts immediately after the shooting.

Rogers was not listed as a State's witness, and there is nothing in the record indicating that the prosecutor ascertained the whereabouts of Exhibit 18 until the issue about whether Ray was wearing it when he was shot was raised by Defense Counsel during trial. Only then did Exhibit 18 become important to the prosecutor as evidence to rebut Defense Counsel's theory that (a) Ray

was shot at close range (as Appellant testified[8]) and (b) a coat worn by Ray absorbed the lead, copper and unburned powder from the gunshots, thereby accounting for the absence of those substances on Ray's shirt.

■ As a general rule, rebuttal witnesses need not be disclosed. *State v. Schaller,* 937 S.W.2d 285, 290[6] (Mo.App. W.D.1996); *State v. Mitchell,* 622 S.W.2d 791, 797[9] (Mo. App. E.D.1981). There is an exception where a rebuttal witness is called to refute an alibi. *State v. Menteer,* 845 S.W.2d 581, 586[9] (Mo.App. E.D.1992). There is also an exception where the accused discloses he intends to rely on the defense of not guilty by reason of mental disease or defect excluding responsibility and reveals the names and addresses of the witnesses he intends to call in support of that defense. *State v. Curtis,* 544 S.W.2d 580, 582 (Mo. banc 1976). The reason for those two exceptions is explained in *Curtis* but need not be repeated here, as neither exception applies in this appeal.

Exhibit 18 did not rebut an alibi defense or a defense of not guilty by reason of mental disease or defect excluding responsibility. Exhibit 18 rebutted Defense Counsel's theory that Ray was wearing a coat when he was shot at close range while he and Appellant scuffled over the gun.

■ Where a rebuttal witness is called to rebut a defense other than alibi or mental disease or defect, there is no obligation to disclose the witness. *State v. Young,* 781 S.W.2d 212, 216[5] (Mo.App. E.D.1989). We hold the same rule should apply to an item of physical evidence that rebuts a defense other than alibi or mental disease or defect.

Accordingly, we hold the trial court did not err in denying Appellant's motion for mistrial. Appellant's first point is without merit.

Judgment affirmed.

### Appeal 22219

Appellant's second (and final) point relied on is the only claim of error in appeal 22219. It reads:

---

**8.** Appellant told the jury: "We got to scuffling over the gun, and I heard a shot and somehow he ended up getting shot several times." Asked whether he (Appellant) could tell the jurors "how

exactly [Ray] got shot," Appellant replied: "No, I cannot tell them that." According to Appellant, he and Ray were "[a]rm length apart from each other . . . [w]e could touch each other."

"The motion court clearly erred in denying [Appellant's] Rule 29.15 motion, because [Appellant] was denied effective assistance of counsel ... in that [Defense] Counsel failed to object when the prosecutor inflamed the passions and prejudices of the jury in his closing argument by arguing that [Appellant] had 'broken God's law.'"

The remark complained of by Appellant appears in the following context at the conclusion of the opening segment of the prosecutor's closing argument:

"Now the Revised Statutes of Missouri make murder in the first degree a crime, but this is an old, old crime. It is reported Chapter 20 of Exodus, Moses came down from the mountain with tablets, and on those tablets was one emblazoned commandment that said, 'Thou shalt not kill.' This man has broken God's law. I am not asking for an eye or a tooth for a tooth. We are not asking for him to forfeit his life, but Justice demands that he forfeit his freedom."

Appellant was the only witness at the evidentiary hearing in the motion court. He did not mention Defense Counsel's failure to object to the above-quoted segment of the prosecutor's argument.

The motion court's findings of fact and conclusions of law included this:

"Movant's next claim is that his trial counsel was ineffective because he failed to object to the State's reference to Exodus in its closing argument. First, this may have been a part of a reasonable trial strategy by his trial counsel. Movant does not address this possibility nor does he overcome the burden that this was a part of a reasonable trial strategy.

Movant also provides no facts which would help show that he was prejudiced by the decision of his trial counsel not to object to this part of the State's closing argument. Additionally, this type of reference is within the discretion of the trial Judge to allow in even in the event that a timely objection had been made, and there are no facts in evidence which would prove that the trial Judge would have not let the statement to remain."

This court's review of the motion court's judgment is limited to a determination of whether the findings and conclusions of that court are clearly erroneous. Rule 29.15(j); *Leisure v. State,* 828 S.W.2d 872, 873–74 (Mo. banc 1992), *cert. denied,* 506 U.S. 923, 113 S.Ct. 343, 121 L.Ed.2d 259 (1992). Such findings and conclusions are clearly erroneous only if, after review of the entire record, this court is left with the definite and firm impression that a mistake has been made. 828 S.W.2d at 874.

Appellant cites no Missouri case where a prisoner has won post-conviction relief on the ground that his lawyer rendered ineffective assistance in failing to object to a prosecutor's reference to the Bible during closing argument.

In *State v. Debler,* 856 S.W.2d 641 (Mo. banc 1993), cited by Appellant, the accused was convicted by jury of murder in the first degree and sentenced to death. *Id.* at 644. One of his complaints on appeal was that the trial court plainly erred by failing to declare a mistrial, *sua sponte,* during the prosecutor's closing argument in the penalty phase of the trial. *Id.* at 656. The Supreme Court of Missouri said:

"[T]he State made several arguments based on history and the Bible, which were problematic. First, the State invoked these references; then the defense put a 'spin' on them, and then the State twisted them again in rebuttal. The end result turns argument into one of competing theologies and histories, obscuring the instructions of the court. The decision between life and death should not turn on the most compelling Scriptural parallel or the best historical analogy. Because the sentence is being reversed on other grounds, this Court need not decide whether this constituted plain error; but both sides should avoid excessive Biblical and historical references." *Id.*

The Supreme Court affirmed the conviction in *Debler* ; the Supreme Court reversed only the sentence, basing the reversal on the erroneous admission of evidence during the penalty phase, not on the prosecutor's argument. *Id.* at 657.

*Debler* does not aid Appellant for three reasons.

First, there was no issue in *Debler* as to whether the accused's lawyer rendered ineffective assistance in failing to object to the prosecutor's argument.

Second, the Supreme Court did not reverse the conviction in *Debler.* The court reversed only the sentence and did not base the reversal on the prosecutor's argument. In the instant case, the prosecutor's argument could not have affected the sentence on the murder conviction. As demonstrated by the prosecutor's argument, the State did not seek the death penalty. Consequently, once the jurors found Appellant guilty of murder in the first degree, they had *no* option regarding the sentence, as the verdict-directing instruction submitting that offense told the jurors to assess punishment at imprisonment for life without eligibility for probation or parole.

Third, *Debler* did not condemn all references to the Bible; it merely warned counsel to avoid "excessive" references. In the instant case, the remark complained of by Appellant was the prosecutor's only reference to the Bible during closing argument. In *State v. Shurn,* 866 S.W.2d 447, 454 (Mo. banc 1993), *cert. denied,* 513 U.S. 837, 115 S.Ct. 118, 130 L.Ed.2d 64 (1994), decided seven months after *Debler,* the accused was convicted of murder in the first degree and sentenced to death. On appeal, the accused complained that the prosecutor erroneously invoked the Bible during closing argument in the penalty phase of the trial by stating, "I'm asking you [the jury] to take an eye for an eye," while referring to the Old Testament. *Id.* at 463–64. The Supreme Court, citing *Debler,* held the prosecutor's "isolated reference *does not rise to* the level of plain error." *Id.* at [55].

■ To prevail on a claim of ineffective assistance of counsel, a prisoner seeking post-conviction relief must show (1) his lawyer failed to exercise the customary skill and diligence that a reasonably competent lawyer would have exercised under similar circumstances, and (2) the prisoner was thereby prejudiced. *Sanders v. State,* 738 S.W.2d 856, 857 (Mo. banc 1987).

■ Mere failure to object to an objectionable closing argument does not constitute ineffective assistance of counsel. *Olds v. State,* 891 S.W.2d 486, 491[15] (Mo.App. E.D. 1994); *State v. McRoberts,* 837 S.W.2d 15, 23[22] (Mo.App. E.D.1992). Failure to object constitutes ineffective assistance only where the argument was of such character that it resulted in a substantial deprivation of the accused's right to a fair trial. *Olds,* 891 S.W.2d at 491[15]; *McRoberts,* 837 S.W.2d at 23[22].

■ Here, the motion court found Defense Counsel's failure to object may have been reasonable trial strategy. On the record before us, that finding is not clearly erroneous. The prosecutor's comment was isolated, and in view of *Debler* and *Shurn,* Defense Counsel may not have been confident the trial court would sustain an objection. It is reasonable strategy to forego an objection where the damage from a comment is minimal or nonexistent—a subject addressed in the next paragraph—and there is no assurance an objection will succeed.

■ The motion court also found Appellant had not shown prejudice from Defense Counsel's failure to object. That finding, like the one discussed in the preceding paragraph, is not clearly erroneous. The issue the jury had to decide was whether Ray was killed in the manner shown by the State's evidence or the manner shown by Appellant's evidence. We fail to see how the prosecutor's remark bolstered the State's proof or discredited Appellant's.

Appellant's second point is denied.

The motion court's denial of post-conviction relief is affirmed.

PREWITT, P.J., and PARRISH, J., concur.