STATE of Missouri, Respondent,

v.

Darrell Ray JONES, Appellant.

No. 25322.

Missouri Court of Appeals,
Southern District,
Division One.

April 14, 2004.

Motion for Rehearing or Transfer
Denied May 6, 2004.

Application for Transfer Denied
June 22, 2004.

Lord Tennyson ed., LONDON: MACMILLAN 1908).

Kent Denzel, Asst. Public Defender, Columbia, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Breck K. Burgess, Asst. Atty. Gen., Jefferson City, for Respondent.

ROBERT S. BARNEY, Presiding Judge.

Darrell Jones ("Appellant") appeals his conviction for murder in the first degree, § 565.020, RSMo 2000. Appellant was sentenced to life imprisonment without the possibility of parole.

The sufficiency of the evidence is not an issue on appeal. Viewed in the light most favorable to the verdict, the evidence adduced at trial reveals that on February 14, 2001, Appellant and Janice Brunson ("Victim") were living together and working at the same factory in Neosho. That day, they arrived at work around 6:00 a.m. and appeared happy. Appellant began glaring at Victim when Appellant saw flowers on Victim's desk and saw Victim talking to a male employee. At some point that morning, Appellant left the factory without checking out.

During the 9:00 a.m. break, Victim realized that Appellant was not at work and that her truck was also gone. Around 11:00 a.m., Victim spoke to someone on the telephone and appeared to be upset. Between 11:00 and 11:30 a.m., Victim was heard to say to someone on the telephone, "You have my truck. Bring it back to me or I will call the cops and report it as stolen."

Around 12:15 p.m., Appellant returned to the factory in Victim's truck. Victim left the factory with Appellant and went to the truck. Victim tried to open the driver's side door; however, Appellant pushed her away from the door and they began arguing. Appellant opened the door and got in the truck while Victim went to the passenger's side door. According to one witness, after Victim opened the door, Victim "sat on the seat. She had one foot on the parking lot[,] ... and she appeared to be leaning to try to get her keys from the vehicle." The witness further related that Appellant "took off at a high rate of speed and it threw the door shut. [Victim] went over; the door shut."

Approximately 20 to 30 minutes later, workers at the factory heard two gunshots, in the distance, about five to ten seconds apart.

Between 1:00 and 1:30 p.m., Appellant called the factory and said that he wanted to speak to Victim. He stated that Victim dropped him off at home and then left.

Around 5:00 p.m., Captain Christopher Jennings ("Jennings") of the Newton County Sheriff's Department received a call about an incident that occurred near Boulder City in Newton County. At the access area at the bottom of a bridge crossing a creek at Boulder City, Jennings saw Victim's truck stuck in the mud, and Victim was found dead in the passenger seat of the truck. It was determined that Victim died from blood loss after being shot twice, at close range, in the chest with a 12 gauge shotgun.

At approximately 10:30 p.m., Jennings went to the residence shared by Appellant and Victim, but no one was at the home. Jennings observed a vehicle in the driveway and discovered its license plate was registered in Appellant's name at an address in Granby. Jennings went to that address and spoke to Appellant's sister, who gave Jennings the address of Appellant's mother in Granby. Around 11:00 p.m., Jennings arrived at the home of Appellant's mother and found Appellant and his mother there.

Jennings asked Appellant if he would come with him to the Sheriff's Department to speak with deputies. Appellant responded, "Sure. No problem." Jennings found it odd that Appellant did not question why the deputies wanted to speak to him.

Jennings took Appellant to the Sheriff's Department in Neosho. Appellant was taken into an interview room, was informed of his *Miranda*[1] rights, and executed a written waiver of those rights at 11:34 p.m.

Initially, Appellant claimed he had nothing to do with the murder. He said that he had last seen Victim when she dropped him off at his sister's house. He said, because no one was home there, he walked to an address on Highway 86 and called his brother to come pick him up.

After detectives spoke to Appellant's brother to determine whether Appellant's story was true, Jennings told Appellant that Appellant's brother denied picking Appellant up. Appellant responded that his brother was lying. Officers spoke to Appellant's brother again, and he told the officers that he had received a call at his mother's house. Officers went to the house and checked the caller identification on the telephone. The officers found an incoming call at 1:19 p.m. from the home of Rick Warden, who lived a few hundred yards from where Victim and the truck were found. Based on this information, Jennings told Appellant that they had evidence that placed Appellant near the scene of the murder. Appellant then admitted that his original statement was incorrect and indicated he wanted to make some changes.

Appellant told Jennings that he and Victim had been fighting over what he perceived to be her infidelity with people with whom they worked. Appellant said that he took the shotgun with him in the truck because he wanted to kill her and then kill himself. He admitted that he picked Victim up at work and then drove her to a conservation area outside of town where he shot Victim twice in the chest.

Appellant also said that the truck got stuck in the mud near Boulder City and that he threw the shotgun into the brush near the access area. When taken there by officers, Appellant did not show them where the shotgun was located. The next morning, the weapon was found inside a log in the general area Appellant had previously indicated. The 12 gauge pump-action shotgun, which was capable of holding one shell in the firing chamber and four shells in the magazine, contained one live shell in the firing chamber and two in the magazine.

After the shotgun was found, Detective Rick Geller ("Geller") again informed Appellant of his *Miranda* rights. Appellant said he was unwilling to sign an additional waiver but that he was willing to talk to Geller. Appellant told Geller that his original plan was to kill Victim and show her body to the man with whom he thought she was having an affair. While he stated that he did not know if he planned to kill the man, Appellant said that he planned on taking Victim's body home, putting it into bed, getting into bed with the body, and killing himself.

Appellant also told Geller that when he picked Victim up at work he hinted to her that she was going to die and that he thought Victim knew she was going to die. Appellant stated that he shot her so that she would not cheat on him anymore. When asked why he lied to the officers about where the gun was located, Appellant told Geller that he was not going to

---

1. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

make it easy on the officers because he had done his job, and he was going to make the officers do their job and investigate the case.

On March 16, 2001, Appellant was charged by information with murder in the first degree in the Newton County Circuit Court. On a change of venue, the case was moved to the Lawrence County Circuit Court. On November 1, 2002, the information was amended to identify Appellant as a prior offender.

At trial, the State presented the testimony of two psychologists, Dr. Jeanette Dunkin and Dr. Stephen Jackson, who both found that Appellant did not suffer from a mental disease or defect. In this connection, these two witnesses testified that the diagnosis of the defense psychiatrist would not exclude a person from having the capacity to deliberate.

Appellant presented the testimony of Dr. William Logan. Dr. Logan indicated that Appellant's ability to deliberate was impaired by chronic depression. Dr. Logan testified that Appellant appeared to be shocked by what he had done and tried to take steps to cover it up. Dr. Logan did acknowledge, however, that "you could just as easily conclude from this course of facts that he purposely took the gun to kill her there with it...." Dr. Logan went on to say that, "the only two people that were there, one of them is dead. He's the only source of information for what happened in the car."

Appellant also called several family members and a co-worker who testified that Appellant and Victim had a difficult relationship and that Victim screamed at Appellant and hit him.

One of Appellant's sisters testified that she, personally, suffered from chronic depression. She added that based on her experience with depression, Appellant appeared to be depressed after he was with Victim. She testified that she believed Appellant may have been using marijuana and that he was probably drinking alcohol.

In rebuttal, the State presented the testimony of Victim's daughters, Amy Hill ("Hill") and Meghan Gyetvai ("Gyetvai"). They testified that Victim was a sweet, kind, and loving person. Hill testified that Appellant did not appear to be depressed despite the fights that sometimes occurred between Appellant and Victim.

The jury found Appellant guilty as charged. Finding Appellant was a prior offender, the trial court sentenced Appellant to life in prison without the possibility of parole. This appeal followed.

Preliminary to our discussion of Appellant's first point we note that prior to trial Appellant filed a motion in limine, entitled "Motion to Admit Limited Evidence About CVSA." In it he sought to exclude the results of a computerized voice stress analysis test ("CVSA"), which purportedly showed that, prior to his confession to Victim's murder, he lied to law enforcement officials when undergoing questioning. Nevertheless, in the same motion, he sought to be able to testify that he only confessed to the crime after being told he failed the CVSA. During the trial, the trial court ruled, based on *State v. Baldwin,* 808 S.W.2d 384 (Mo.App.1991),[2] that if Appellant injected the issue of the CVSA into the case, that the court "may" allow the State to bring in the results of the CVSA "to explain negative inferences raised."

---

**2.** The court in *Baldwin* found that "[w]here the accused has injected an issue into the case, the State may be allowed to present otherwise inadmissible evidence to explain or counteract a negative inference raised by the issue the accused injects." *Id.* at 392.

Because he felt that he could not "risk putting in any evidence about the CVSA," Appellant then requested leave to present an offer of proof as to what the evidence would have otherwise been from the officers who interrogated him and administered the CVSA.

Following Appellant's offer of proof, the trial court overruled the offer of proof and responded as follows:

> [T]hat my ruling would be where—if the accused injects the issue in the case, the Court would probably allow the—the State to present otherwise inadmissible evidence which would be the results. So I guess it's your—I realize there's always decisions the defense has to make, but as it comes up, that's my indications.

Thereafter, during the course of proceedings, Appellant presented no testimony that the interrogating law enforcement officers told him he "failed" the CVSA.

 Now, in Appellant's first point on appeal, he maintains the trial court erred in "refusing to permit [Appellant] to present to the jury relevant evidence on the issue of voluntariness of his statements to the police." As best we discern, the actual basis of Appellant's point on appeal is that the trial court ruled improperly on his motion in limine and that the error "forced [Appellant] to forego his defense or allow the introduction of inadmissible evidence that lacked scientific foundation." Based on this argument, Appellant maintains we must reverse his conviction. We disagree.

 In so far as Appellant's first point on appeal alleges error arising from the trial court's interlocutory ruling on his motion in limine, we observe that the trial court's interlocutory ruling preserved nothing to appeal. "A motion in limine has the salutary purpose of pointing out to the court and to opposing counsel which anticipated evidence might be objectionable."

*State v. McCullum*, 63 S.W.3d 242, 259 (Mo.App.2001). This allows the trial court to reconsider the prior ruling "against the backdrop of the evidence actually adduced and in light of the circumstances that exist when the questioned evidence is actually proffered." *Id.* Nevertheless, a ruling on a motion in limine is interlocutory and " 'is subject to change during the course of the trial.' " *Id.* (quoting *State v. Purlee*, 839 S.W.2d 584, 592 (Mo. banc 1992)). Therefore, " '[t]he motion in limine, in and of itself, preserves nothing for appeal.' " *Id.* (alteration in original) (quoting *Purlee*, 839 S.W.2d at 592).

Here, the trial court ruled on the pretrial motion in limine during the trial; however, this ruling was not final or conclusive on the matter. After the trial judge announced that if Appellant injected the issue, the court "may" or would "probably" allow the State to introduce the test results into evidence, Appellant made a strategic decision not to testify. Because Appellant did not testify, the State had no reason to enter the test results into evidence. And because the State did not attempt to admit the test results, Appellant could not object to the evidence. Accordingly, the trial court was never given the opportunity to rule on the admissibility of the test results against the backdrop of Appellant's testimony or in light of other circumstances that might have existed had the State actually proffered the test results. *Id.*

Furthermore, even assuming *arguendo* that the trial court erroneously ruled on the motion in limine, that cannot, in this instance, constitute reversible error sufficient to warrant a new trial. Based on the interlocutory rulings, Appellant and his counsel "made a strategic and justifiable decision not to testify." *Id.* at 260; *see also State v. Johnson*, 901 S.W.2d 60, 62 (Mo. banc 1995). However, this was not

the only option available to Appellant. Because the ruling was subject to change, Appellant could have testified regarding the CVSA and then sought a different ruling from the trial court if and when the State attempted to enter the test results. *See Johnson,* 901 S.W.2d at 62; *McCullum,* 63 S.W.3d at 260. "Moreover, if indeed [Appellant] and his lawyer were firm in their belief that the questioned evidence was inadmissible, they could have brought an appeal in the event such evidence had been admitted over their objection." *McCullum,* 63 S.W.3d at 260. Given these circumstances we do not discern how the trial court abused its discretion or otherwise denied Appellant a fair trial. Point one is denied.

■ Appellant's second point on appeal asserts the trial court erred in allowing the State to present rebuttal evidence from an unendorsed witness, Hill, on the issue of mental disease or defect. Appellant argues that the State is required to identify rebuttal witnesses if the defendant relies on the defense of mental disease or defect and if the purpose of the rebuttal witness is to rebut the defense of mental disease or defect.

■ "As a general rule, rebuttal witnesses need not be disclosed." *State v. Clark,* 975 S.W.2d 256, 263 (Mo.App.1998); *see also* Rule 23.01(f).[3] The two exceptions to this rule, based on the theory of reciprocal discovery, are when the rebuttal witness is called (1) to refute an alibi and the defense has disclosed his alibi witnesses and (2) to refute a defense of mental disease or defect excluding responsibility and the defense has disclosed its witnesses on the matter. *Clark,* 975

S.W.2d at 263; *see also State v. Curtis,* 544 S.W.2d 580, 582 (Mo. banc 1976).

■ The defendant is required to disclose an intent "to rely on the defense of alibi" and "the names and addresses of the witnesses by whom he proposes to establish such alibi." Rule 25.05(A)(5). Similarly, the defendant is required to disclose his intent "to rely on the defense of mental disease or defect excluding responsibility" and "[a]ny reports or statements of experts made in connection with the particular case ... which the defense intends to introduce into evidence...." Rule 25.05(A)(1) and (4). Due process requires "that the State be required to disclose the names and addresses of persons it intends to call as rebuttal witnesses in both situations." *Curtis,* 544 S.W.2d at 582; *see also Wardius v. Oregon,* 412 U.S. 470, 472, 93 S.Ct. 2208, 2211, 37 L.Ed.2d 82 (1973).

In the present case, Appellant disclosed prior to trial that he was not relying on the defense of mental disease or defect excluding responsibility, but rather that he was relying on the defense of diminished capacity.

■ The defense of mental disease or defect excluding responsibility, and the defense of diminished capacity are two separate doctrines. The doctrine of diminished capacity allows the defendant to introduce evidence of a mental disease or defect to prove that he did not have the requisite mental element of the crime charged. *State v. Gary,* 913 S.W.2d 822, 827 (Mo. App.1995), overruled in part on other grounds by *State v. Carson,* 941 S.W.2d 518 (Mo. banc 1997). This latter doctrine is different from the doctrine of mental disease or defect excluding responsibility,

---

**3.** Rule references are to Missouri Court Rules 2002.

The provisions of this rule now appear in essentially the same form in Rule 23.01(e),

Missouri Court Rules 2003, effective January 1, 2003.

"which provides a defendant is not criminally responsible for his conduct 'if, at the time of such conduct, as a result of mental disease or defect he was incapable of knowing and appreciating the nature, quality, or wrongfulness of his conduct.' " *Id.* (quoting § 552.030.1, RSMo 1994).

■ Under the doctrine of diminished capacity, "the defendant accepts criminal responsibility for his conduct but seeks conviction of a lesser degree of the crime because the mental disease or defect prevented the defendant from forming the mental element of the higher degree of the crime." *Id.* at 827–28.

Because Appellant did not disclose he was employing either of the two defenses requiring reciprocal discovery, namely alibi or mental disease or defect excluding responsibility, the State was not required to endorse and disclose Hill as a rebuttal witness. *See Clark,* 975 S.W.2d at 263. Point Two is denied.

■ In his third point on appeal, Appellant argues the trial court erred in refusing to instruct the jury using his proposed converse "Instruction A". He maintains the trial court misinterpreted the applicable Notes on Use.

The record shows that the trial court submitted Appellant's converse instruction on Appellant's mental state, Instruction 7, which was modeled after MAI–CR3d 308.03. Instruction 7 provided:

You may consider evidence that [Appellant] had or did not have a mental disease or defect in determining whether [Appellant] had the state of mind required to be guilty of murder in the first degree.

The term "mental disease or defect" means any abnormality regardless of its medical label, origin, or source.

If, after considering all of the evidence, including evidence that [Appel-lant] did or did not have a mental disease or defect, you have a reasonable doubt as to *whether [Appellant] coolly reflected,* you must find [Appellant] not guilty of murder in the first degree as submitted in Instruction No. 6.

(Emphasis added.)

The trial court, however, refused to submit Appellant's Instruction A, modeled after MAI–CR3d 308.02, which provided: "Unless you find and believe from the evidence beyond a reasonable doubt *that [Appellant] coolly reflected,* you must find [Appellant] not guilty of murder in the first degree as submitted in Instruction No. 6." (Emphasis added.)

MAI–CR3d 308.03, Notes on Use 7, provides: "The use of this instruction does not prevent a defendant from also using a converse instruction based on MAI–CR3d 308.02; however, such converse based on MAI–CR3d 308.02 *may not include the mental element conversed in this instruction.*" (Emphasis added.)

This same issue was addressed by the Missouri Supreme Court in *State v. Roberts,* 948 S.W.2d 577 (Mo. banc 1997). As in *Roberts,* both of Appellant's "proffered instructions conversed the element of deliberation." *Id.* at 603. Thus, "the Notes on Use advise that both instructions could not be given." *Id.* Accordingly, we find the trial court did not err in refusing to submit both instructions. *Id.* Point Three is denied.

■ Appellant's fourth point on appeal asserts the trial court erred in permitting the State to present the rebuttal evidence of Hill and Gyetvai. Appellant maintains these two rebuttal witnesses were in the courtroom during the trial in violation of the "[r]ule concerning exclusion of witnesses."

"A trial court has the authority to direct the exclusion of witnesses so that they will not be privy to testimony provided by other witnesses." *State v. Lawrence,* 64 S.W.3d 346, 353 (Mo.App.2002). "The remedy or sanction available to a court for violation of 'the rule' is to disqualify the offending witness from testifying." *State v. Griffen,* 978 S.W.2d 445, 447 (Mo.App.1998). The decision whether to exclude the testimony of a witness who has violated "the rule" lies within the trial court's sound discretion. *State v. Sexton,* 929 S.W.2d 909, 914 (Mo.App.1996).

> However, violation of "the rule" does not automatically warrant the exclusion of the witness who violates the rule. To the contrary, it is only when certain "special circumstances" exist that a trial court should exclude the testimony of a witness who violates the witness exclusion rule. As a general rule, these "special circumstances" exist only where there is proof that the witness violated the rule with "the consent, connivance or procurement of the party or counsel calling him."

*Griffen,* 978 S.W.2d at 447 (citations omitted). "Furthermore, when such witnesses testify in rebuttal and not on a matter for the state's case in chief, there is no abuse of discretion by the trial court." *State v. McMillian,* 779 S.W.2d 670, 671 (Mo.App. 1989).

In the instant case, the trial court invoked the witness exclusionary rule in response to Appellant's request. During the trial, Appellant presented the testimony of a psychiatrist regarding Appellant's ability to deliberate. Appellant also presented the testimony of a friend and family members regarding the Victim's personality and the relationship between Appellant and Victim. Before the State called Hill and Gyetvai as rebuttal witnesses, Appellant objected on the ground that they had been present in the courtroom in violation of "the rule." The prosecutor for the State informed the court that he did not know he would be calling Hill and Gyetvai until Appellant had presented his entire case, and it was then he decided the testimony of Hill and Gyetvai would be needed for rebuttal. The trial court overruled Appellant's objection.

During her testimony, Hill testified about Victim's personality and her observations of interactions between Appellant and Victim. Gyetvai also testified about Victim's personality. Their testimony related to collateral issues not directly bearing on Appellant's guilt or innocence of the crime charged or the elements of that offense. *See Sexton,* 929 S.W.2d at 914. Further, Appellant has not shown that the prosecutor knew he was going to call Hill and Gyetvai in rebuttal to the evidence presented by Appellant, or that the prosecutor purposely allowed these witnesses to remain in the courtroom in violation of witness exclusionary rule. We find no abuse of discretion in the trial court allowing Hill and Gyetvai to testify on rebuttal. *See id.* Point Four is denied.

Appellant alleges in his fifth point on appeal that the trial court committed plain error in allowing the State to present, as he terms it, Gyetvai's "improper 'victim impact' evidence." [4] Appellant further maintains the trial court erred in denying Appellant's motion for a mistrial for prosecutorial misconduct after the State presented the evidence at issue.

The substance of Gyetvai's testimony was that she was pregnant with her second child and had informed Victim that she was pregnant with her first child two days

---

**4.** *See* § 565.030.4, RSMo 1994.

before Victim was killed. Gyetvai's testimony described Victim as follows:

> [Victim] was not a shy person. She was very strong-willed, very outgoing. She wasn't afraid to let you know what she wanted. She was also very sweet and kind, a very loving person. She took care of people.

Gyetvai also responded that she missed Victim.

Appellant did not make a timely objection as to any of Gyetvai's testimony. Rather, after Gyetvai was excused and the State rested, Appellant moved to exclude Gyetvai's testimony on the ground that it was irrelevant and was "intended to arouse the passion of the jury." Appellant also requested a mistrial based on prosecutorial misconduct in calling Gyetvai and eliciting her purportedly improper testimony.

Appellant argues that Gyetvai's testimony constituted "victim impact evidence." He also argues that the testimony was not logically relevant, in that it was not probative of any issue in dispute and was elicited "to engender sympathy for [Victim], and for Ms. Gyetvai and her children for their loss."

■ Because Appellant failed to object during Gyetvai's testimony and his motion to strike was made after Gyetvai was excused, we review for plain error only. *State v. Kreutzer*, 928 S.W.2d 854, 867 (Mo. banc 1996); Rule 30.20. "Plain error affecting substantial rights may be considered if it appears that the alleged error so substantially affected defendant's rights that a miscarriage of justice or manifest injustice would occur if the error is not corrected." *State v. Williams*, 97 S.W.3d 462, 470 (Mo. banc 2003); Rule 30.20.

■ We first note Appellant had previously presented evidence that Victim was an out-going person who yelled at Appellant, fought with him, was mean and

crude, and that Appellant's dealings with her left him feeling depressed and with an impaired ability to deliberate in her murder. Gyetvai's testimony describing Victim as loving and kind person was offered in response to the negative image of Victim advanced by Appellant. "Under the doctrine of curative admissibility, 'where the defendant has injected an issue into the case, the state may be allowed to admit otherwise inadmissible evidence in order to explain or counteract a negative inference raised by the issue defendant injects.'" *State v. Weaver*, 912 S.W.2d 499, 510 (Mo. banc 1995) (quoting *State v. Lingar*, 726 S.W.2d 728, 734–35 (Mo. banc 1987)). Because Gyetvai's testimony describing Victim was introduced to counteract the negative inferences raised by Appellant's evidence, we find the trial court did not plainly err in allowing this testimony. *See id.*

■ As to Gyetvai's testimony regarding her first pregnancy and that she missed Victim, Appellant has failed to show how this testimony resulted in a miscarriage of justice or a manifest injustice. While it is possible the testimony engendered some feelings of sympathy for Victim and her family, the State did not emphasize this testimony during closing arguments. Furthermore, there was overwhelming evidence that Appellant was guilty of the crime charged.

Appellant admitted to Jennings that he took the shotgun with him in the truck when he went back to work to pick up Victim because he wanted to kill her and then kill himself. Appellant also told Geller that his original plan was to kill Victim and then show her body to the man with whom Appellant thought Victim was having an affair. Appellant further related that he planned on taking Victim's body home, putting it in bed, getting into bed with her body, and killing himself. Addi-

tionally, Appellant also told Geller that after he picked Victim up from work he had indicated to her that she was going to die and that he thought Victim knew she was going to die. Appellant stated he shot Victim so that she would not cheat on him again.

Appellant has not shown this Court any evidence that Gyetvai's testimony was so prejudicial that it resulted in a miscarriage of justice or a manifest injustice. *See State v. Clements*, 849 S.W.2d 640, 645 (Mo.App.1993). We find the trial court did not plainly err in allowing Gyetvai's testimony.

Appellant also alleges the trial court erred in failing to grant a mistrial based on prosecutorial misconduct for calling Gyetvai and eliciting her irrelevant testimony.

■■■ "The standard of review for a ruling on a request for a mistrial is abuse of discretion." *State v. Mahoney*, 70 S.W.3d 601, 606 (Mo.App.2002). "The declaration of a mistrial is a drastic remedy that should be employed only in extraordinary circumstances in which prejudice to the defendant can be removed in no other way." *State v. Webber*, 982 S.W.2d 317, 322 (Mo.App.1998). "[W]e will not reverse a trial court's exercise of discretion absent a showing of clear abuse and substantial prejudice resulting to the defendant." *Id.* at 323. "Judicial discretion is deemed abused only when a trial court's ruling is clearly against the logic of the circumstances then before it and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration." *State v. Neff*, 978 S.W.2d 341, 345 (Mo. banc 1998).

Considering the other and more compelling evidence of Appellant's guilt, as previously recited, we cannot say that Appellant was unduly prejudiced by Gyetvai's testimony such that the trial court abused its discretion in denying Appellant's request

for a mistrial. *Mahoney*, 70 S.W.3d at 606; *see Clements*, 849 S.W.2d at 645. Point Five is denied.

■■■ In his sixth point on appeal Appellant alleges the trial court erred in "overruling [Appellant's] objection to the State's question of Dr. Jackson about the factors indicating that [Appellant] had the capacity to deliberate...."

■■■ "An expert may testify as to his or her opinion on an ultimate issue in a criminal case, so long as the expert does not express an opinion as to the guilt or innocence of the defendant." *State v. Fairow*, 991 S.W.2d 712, 715 (Mo.App.1999). "Ultimately, it is within the discretion of the trial court to admit expert testimony." *Id.* An expert may testify as to a defendant's *ability* to deliberate, but may not testify as to whether a defendant *actually* deliberated. *Clements*, 849 S.W.2d at 645; *State v. Clements*, 789 S.W.2d 101, 110 (Mo.App.1990) ("Deliberation was an ultimate issue for the jury alone under appropriate instructions.")

The record reveals that during Appellant's counsel's opening statement, counsel related that Dr. Logan would testify for the defense to the effect that Appellant's ability to deliberate was diminished at the time of Victim's death.

In the State's case in chief, the State asked Dr. Jackson what factors he would consider to determine whether or not Appellant had a capacity to deliberate. Dr. Jackson responded, in part, as follows:

> He talked to us about getting out of the truck at one point, for example, saying he had to cool off. One of the statements that he made in the records was that he had thought about hitting the victim, and he didn't want to do that, and that's why he got out of the truck to do that.

With those statements made, one of the things that indicates to me that he may have had the capacity to deliberate is that he was at least able to consider his situation and weigh some of the things that were available.

At no time did Dr. Jackson testify that Appellant had deliberated or that he was guilty of the crime charged. Dr. Jackson did not definitely conclude that Appellant had the capacity to deliberate. Rather, Dr. Jackson testified that Appellant *"may have had the capacity* to deliberate." (Emphasis added.) Accordingly, we are unable to discern how Dr. Jackson's testimony invaded the province of the jury as to the ultimate issue of deliberation, nor can we conclude the trial court erred in overruling Appellant's objections to Dr. Jackson's testimony. *See Clements,* 849 S.W.2d at 645. Point Six is denied.

■ Appellant's final point on appeal asserts the trial court erred in overruling Appellant's objection and allowing the State to cross-examine Dr. Logan about the fact that he had examined a defendant in an unrelated case.

■ " 'Wide latitude is afforded the cross-examination of witnesses to test qualifications, credibility, skill or knowledge, and the value and accuracy of the expert's opinion.' " *Middleton v. State,* 103 S.W.3d 726, 741 (Mo. banc 2003) (quoting *State v. Brooks,* 960 S.W.2d 479, 493 (Mo. banc 1997)). Furthermore, "[p]rosecutors have wide latitude in cross-examining psychological experts because the factual basis for psychiatric testimony is particularly important." *State v. Parker,* 886 S.W.2d 908, 927 (Mo. banc 1994). Additionally, "the pecuniary interest, bias or prejudice of a witness may always be shown." *State v. Anderson,* 79 S.W.3d 420, 437 (Mo. banc 2002).

During the State's cross-examination of Appellant's expert witness, the State asked Dr. Logan how long he had been performing evaluations for Appellant's counsel. Dr. Logan indicated it had been approximately 15 years. The State then asked, "And, in fact, James Copher—You did James Copher's—a murder suspect's evaluation not too long ago?" Appellant's counsel objected to the mention of the capital murder case because the question "tends to associate [Appellant's] name with the name of some other person who is accused of murder." The trial court overruled the objection. Dr. Logan went on to testify that he had started working with Appellant's counsel on the other case, but he had not reached any conclusions in that case.

While we question the propriety of the prosecutor's conduct in this respect, Appellant has not shown this Court how the trial court's ruling resulted in any prejudice to him such as to result in an unfair trial. Based on the State's questions, it is possible the jury unfavorably compared Appellant to James Copher, a murder suspect. Alternatively, it is possible the jury viewed Dr. Logan as more knowledgeable and credible because of his involvement with a high profile case. We are unable to conclude that Appellant was prejudiced by the State's questioning of Dr. Logan. We determine the trial court did not abuse its discretion in overruling Appellant's objection. Point Seven is denied.

The judgment and sentence of the trial court is affirmed.

PREWITT, J. and GARRISON, J., concur.